## WILLIAM RYAN, RESPONDENT, v. CHARLES KNORR, APPELLANT.

*Seneca Nation — right of Indian to lease land — act of Congress of 1875, chapter 90, confirms prior leases — it supersedes a prior treaty — when the same lot is leased to two persons the one receiving the first lease has the better title.*

The act of Congress of February 19, 1875, chapter 90 of that year, authorizing the Seneca Nation of New York Indians to lease lands within their reservations, and confirming existing leases, was intended to give validity to all existing leases given by Indians to white persons, for the period of at least five years from the passage of the said act, and to render them binding upon the parties thereto, and upon the Seneca Nation.

Even if the act of 1875 was in conflict with the provisions of the prior treaties entered into between the United States and the Indians, yet the act superseded the prior treaties, and the consequences arising from such conflict are beyond the sphere of judicial cognizance.

When an Indian, prior to the passage of said act, leased the same land to two different persons, *held*, that the one who received the first lease had the better title.

Powers of Congress and of the State in reference to the Indians, considered.

APPEAL from a judgment in favor of the plaintiff, entered upon the report of a referee.

The action was in ejectment to recover the possession of certain land in the Indian Reservation.

*James G. Johnson,* for the appellant.

*Henderson & Wentworth,* for the respondent.

TALCOTT, P. J.:

This is an appeal from a judgment in favor of the plaintiff, entered on the report of a referee. It comes up on the report of the referee alone, no case containing the evidence being submitted. The action is ejectment for thirteen acres of land, situated in the village of Salamanca, in Cattaraugus county, in this State, and being within the bounds of the "Alleghany Reservation."

This reservation is a tract of land, by certain treaties between the United States and the Seneca Nation of Indians, reserved to

that nation. Neither of the parties is a Seneca Indian, both being white men. From the report of the referee it appears, in substance, that on the 31st of January, 1868, one George Jemison, a Seneca Indian, residing on the said reservation, executed and delivered to the plaintiff a lease of the premises described in the complaint, for the term of twelve years, at the annual rent of twelve dollars. Soon after the making of the said lease, the plaintiff entered under the same, and made some improvement thereon, clearing a portion thereof from timber and stumps, and improved a portion thereof for agricultural purposes. On or about the 26th of April, 1870, the same George Jemison executed and delivered another lease of the same land to the defendant, who also entered and made improvements of the same character. Neither party resided on the land, and each has paid the rent reserved in his lease. In February, 1875, the plaintiff commenced to build a dwelling-house upon the said premises, when the defendant forbid his doing so, and claimed the exclusive possession of the whole of said premises under his (the defendant's) lease. Both the said leases were "formal and existing" leases at the time of the approval of the act of Congress of February 19, 1875, on which day the act of Congress, entitled "an act to authorize the Seneca Nation of New York Indians to lease lands within the Cattaraugus and Allegany reservations, and to confirm existing leases" became a law. (18 U. S. Statutes at Large, chap. 90, p. 330.)

The said act of Congress, amongst other things, provided that all leases of land within the Cattaraugus and Allegany reservations in the State of New York, heretofore made by the authority of the Seneca Nation of New York Indians to railroad corporations, are hereby ratified and confirmed, and said Seneca Nation may, in accordance with their laws and form of government, lease lands within said reservations for railroad purposes. The act then provides that the president of the United States shall appoint three commissioners, whose duty it shall be, as soon as may be, to survey, locate and establish proper boundaries and limits of six specified villages within said Allegany reservation, "including therein, as far as practicable, all lands now occupied by white settlers, and such other lands as in their opinion may be reasonably required for the pur-

poses of such villages; and they shall cause a return of their doings in writing, together with maps of such surveys and locations, duly certified by them, to be filed in the office of the county clerk of the county of Cattaraugus in said State, there to be recorded and preserved. The boundaries of said villages so surveyed, located and established shall be the limits of said villages for all the purposes of this act." The act then proceeds in section 3 : " That all leases of land situate within the limits of said villages, when established as hereinbefore provided, except those provided for in the second section of this act, in which Indians, or said Seneca Nation, or persons claiming under them are lessors, shall be valid and binding upon the parties thereto and upon said Seneca Nation, for a period of five years from and after the passage of this act, except such as by their terms may expire at an earlier date, and at the end of said period, or at the expiration of such leases as terminate within that time said nation, through its counselors shall be entitled to the possession of the said lands, and shall have the power to lease the same," and the said section then goes on to provide that the said leases, at the expiration of said period or at their termination shall be renewable for periods not exceeding twelve years, and that the owners of improvements erected on said lands shall be entitled to such renewed leases upon terms to be agreed upon between them and the said counselors ; or, in case they are unable to agree on the terms, then they are to be settled by referees to be appointed as therein specified ; and the said act further provides, in section 4, that the said Seneca Nation is authorized by resolution of its counselors, duly elected according to the laws and system of government of said nation, to lease lands within said villages to which, by the laws or customs of said nation, no individual Indian or Indians, or *other person claiming under him or them*, has, or is entitled to the rightful possession. The act further provides, that it shall be the further duty of the said commissioners to cause all lands within said villages now leased to be surveyed and defined, and to cause the same to be designated upon the maps of such villages, and for the recording of all such leases in the office of the clerk of Cattaraugus county, and that the courts of the State of New York in the county of Cattaraugus having jurisdiction in real actions, and the Circuit

and District Courts of the United States for the Northern District of New York, shall have jurisdiction of all actions for the recovery of rents and for the recovery of the possession of any real property within the limits of said villages.

Before the commencement of this suit the commissioners, under the said act of Congress, had made the surveys specified, had made and filed their report and maps pursuant to the said act, and the premises in question are surveyed and mapped as a part of the village of Salamanca, one of the six villages named in the act. The premises in question in this suit are designated on the said map as *leased land,* and both the said leases were by the said commissioners entered in a "lease book" prepared by said commissioners, and filed as a part of their report. The plaintiff's said lease was duly recorded pursuant to said act, in the office of the clerk of Cattaraugus county on the 6th day of December, 1875.

Under the constitutional power to regulate commerce with the Indian tribes, and under the treaty power the general government has assumed control over the lands lying within the limits of the United States, occupied by any nation of Indians still retaining to any extent their tribal relations, and this control and jurisdiction has been exclusive, except that the States have been permitted to legislate, so far as necessary to preserve the peace and to protect the Indians from trespasses and intrusions on their lands. (*People ex rel. Cutler* v. *Dibble,* 21 How., 366.)

The Indian tribes are not foreign nations. Their relations to the United States resemble those of a ward to his guardian. They are independent political communities, retaining the right of self-government, subject to the protecting power of the United States, and a State Legislature has no jurisdiction over the Indian territory contained within the territorial limits of such State. (*Cherokee Nation* v. *Georgia,* 5 Peters, 1; *Worcester* v. *Georgia,* 6 id., 515.) "The power of the general government over the Indian tribes and the territory occupied by them, within the constitutional limits of legislation, is plenary. To what extent it shall be exercised rests in the sound discretion of Congress, limited only by considerations of policy and humanity. (*The Cherokee Tobacco,* 11 Wall., 616.)

"The rights of the Indians do not depend on this or any other statutes of the State, but upon treaties which are the supreme law of the land ; it is to these treaties we must look to ascertain the nature of these rights, and the extent of them." (Per NELSON, J., in *The New York Indians*, 5 Wall., 768.)

Before and after the adoption of the Constitution of the United States, the Federal government made several treaties with the New York Indians, the treaty of Canandaigua, to which the Seneca Nation was a party, being one ; and by that it was agreed that the land in the several reservations mentioned belonged to the said Indians, and that the United States would never claim the same, nor disturb the Indians, but it should remain theirs until they chose to sell the same to the people of the United States.

By the treaty of 1838 with the Seneca Nation, several of the reservations, including the Cattaraugus and Allegany reservations, were, with the consent of the United States, agreed to be ceded to the pre-emption owners, the assignees of Massachusetts ; but, differences having arisen between the Indians and the pre-emptive owners, a new treaty was made in 1842, by which it was agreed that the Indians should remain in the possession of the Allegany and Cattaraugus reservations, with the same right and title in all things which they had before the sale (the treaty of 1838), which was the original and absolute right of occupancy. Two other reservations, the Buffalo Creek and Tonawanda reservations, being ceded to Ogden and Fellows, as the representatives of the owners of the pre-emptive title, the Indians accordingly remained in possession of the two retained reservations. In the year 1845, the Legislature of this State passed an act giving its sanction to a form of government for the Indians residing on the Allegany and Cattaraugus reservations, having more semblance of a systematic government than had theretofore prevailed among them, which act provided that the Seneca Nation of Indians, residing on the Allegany and Cattaraugus reservations in this State, shall be deemed to hold and possess said reservations as a distinct community, and authorizing them by the name of the " Seneca Nation of Indians," to prosecute and maintain, in all courts of law and equity in this State, any suit or proceeding necessary or proper to

protect the rights and interests of the said nation in and to the said reservations.'

This, in the ordinary form of a legislative enactment, contained many other provisions and regulations in regard to the powers and duties of the officers of the said Seneca Nation, in respect to which it may be doubted whether the Legislature of New York had any jurisdiction or authority. (Laws of 1845, chap. 150.) This act was materially amended in 1847 (chap. 365). It is understood that both of these acts were passed at the request of the Seneca Nation, and they appear to have been acquiesced in by their people. By the act of 1847, the right of the chiefs of said nation to set apart to the use of any individual Indian, or Indian family, so much of said land within said reservations " as the chiefs shall deem reasonable and an equitable proportion in reference to the whole number of Indians not possessing land," is acknowledged, not to say conferred.

By the 12th section of the act of Congress of 1834 (4 U. S. Statutes at Large, chap. 161, p. 729), it was provided that " no purchase, grant, lease or other conveyance of lands or of any title or claim thereto from any Indian nation or tribe of Indians shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution," etc.

And by the 11th section of the same act, all persons were prohibited from making " a settlement on any lands belonging, secured or granted by treaty with the United States to any Indian tribe," or to survey or to attempt to survey such lands or designate any of the boundaries by marking trees, etc., and the president was authorized to take such measures and employ such military force as he should deem necessary to remove such trespassers. By the act of Congress of June 14, 1862, chap. 101, 12 U. S. at Large, p. 427, it was provided, " that whenever any Indian, being a member of any band or tribe with whom the government has or shall have entered into treaty stipulations, being desirous to adopt the habits of civilized life, shall have had a portion of the lands belonging to his tribe allotted to him in severalty in pursuance of such treaty stipulations, it shall be the duty of the agent and superintendentof such tribe to provide

that such Indian shall be protected in the peaceful and quiet occupation and enjoyment of the lands so allotted to him."

Prior to the passage of the act -of Congress before referred to (approved February 19, 1875), one or more railroads, with the consent of the said Seneca Nation, had occupied portions of said Allegany and Cattaraugus reservations, claiming the right of way by or under contracts with the Seneca Nation to which the general .government was not a party and to which it had not given any express sanction, and many white persons had settled upon the Allegany reservation, forming the villages composed of white settlers mentioned in the second section of the said last mentioned act. The white settlers in general occupied their respective lots under leases given by individual Indians residing on said reservation, presumptively under allotments to the various Indian lessors, pursuant to the laws and customs of the Seneca Nation, and under the supposed sanction of the act of Congress of 1862 above quoted, and also of the legislative authority of this State in the act of 1847. They had made valuable improvements on their respective lots, had built the several villages mentioned, where before it was a wilderness, and lived in general harmony with the Indians on the reservation; under such circumstances the act approved February 19, 1875, was passed and grew out of the necessities of the case. It will be perceived by an examination of its provisions that its intent is to maintain generally all the rights of the Indians to the soil, and so to speak, to the fee simple of the reservation, and only to legalize such leases as they should thereafter, in accordance with their system of government and their usages, consent to, or presumably had theretofore consented to.

Though the act of February 19, 1875, was, in many respects, carelessly and inartificially drawn or engrossed, one thing is quite apparent from its provisions, to wit: that, among other things, it was designed to give validity to all existing leases where white persons held under Indian lessors, for at least the period of five years from the passage of the act, and to render them binding upon the parties thereto, and upon the Seneca Nation. It may be suggested that such an act of legislation would be in contravention of the treaty which secures to the Indians the land of the said

reservation until they should willingly cede the same to citizens of the United States. But the Indian lessors were, by Congress, presumed to be acting under the authority and with the consent of the Seneca Nation, which had consented to the allotment of the lands leased, to the individual occupancy of the several Indian lessors, and the prohibition against white persons taking a lease from an Indian, being a matter of congressional regulation, its violation could be condoned, or excused, or ratified by Congress. But, assuming that the provision which purports to bind the Seneca Nation to the validity of the leases would be in contravention of such part of the treaty as secures the land to the nation, it is well settled that an act of Congress may supersede a prior treaty. The consequences in all such cases give rise to questions which must be met by the political department of the government. They are beyond the sphere of judicial cognizance. (*Case of the Cherokee Tobacco,* 11 Wall., 616.) Congress being supreme on the subject of intercourse with the Indians, both to regulate commerce with them and to make treaties with them, we think the constitution and laws of the State of New York, so far as they are in conflict with the act of Congress of February 19, 1875, are in effect suspended or abrogated by that act. There is nothing in the act of Congress, giving validity to leases, which determines whether the lease to the plaintiff, or the subsequent lease to the defendant, is entitled to priority. Therefore, the only rule to be resorted to is one not only of natural equity, but of positive law, *qui prior est in tempore potior est in jure,* and apply the law as it would be applied if the leases had been between white persons. We think the plaintiff was entitled to recover, unless the defendant stands in the position of a *bona fide* lessee without notice, which is not found by the referee or, so far as appears, claimed by the defendant.

The judgment should be affirmed.

Present — TALCOTT, P. J., SMITH and HARDIN, JJ.

Judgment affirmed.