# THE SENECA NATION OF INDIANS, APPELLANT, *v.* HARRISON B. CHRISTY, RESPONDENT.

*Conveyance of land in this State by the Seneca Nation of Indians — it must be by a treaty ratified by the senate of the United States — 2 Revised Statutes at Large, 143 — effect of the deposit of the purchase-price in the treasury, and the payment of interest on the same to the Indians, considered — what facts will be held to show an abandonment of the lands, by the Indians, to the grantees.*

In an action of ejectment, brought to recover the possession of a parcel of land formerly embraced within what was known as the Cattaraugus reservation, it appeared that the land in question was included in that part of western New York, which, prior to 1786, was the subject of controversy between the State of New York and the State of Massachusetts; that, in that year, a treaty of cession was entered into between these States, by which Massachusetts relinquished to the State of New York all claim to the government, sovereignty and jurisdiction over such territory, and the State of New York ceded, released and granted to Massachusetts the right of pre-emption of the soil from the native Indians, and all other estate which the State of New York had in the land. It also provided that the commonwealth of Massachusetts might, from time to time, by persons authorized for that purpose, hold treaties and conferences with the native Indians relative to the property or right of soil of such lands, and might grant the right of pre-emption of the whole, or any part of them, to any person or persons who, by virtue of such grant, should take and have the right to extinguish, by purchase, the claims of such Indians, provided that no purchase from them by any such grantees should be valid unless made in the presence of and approved by the superintendent appointed for such purpose by the commonwealth of Massachusetts, and unless such purchase should be confirmed by that commonwealth. In May, 1791, the State of Massachusetts conveyed its title and interest in lands, embracing the premises in question, to Robert Morris, from whom, by sundry mesne conveyances, the title was conveyed to Troup, Ogden & Rogers, commonly known as the Ogden Land Company; to and with whom, on August 31, 1826 a treaty or conveyance was made and executed by the "sachems, chiefs and warriors of the Seneca Nation of Indians, on behalf of such nation," in the presence of Oliver Forward, commissioner appointed by the United States, and of Nathaniel Gorham, superintendent on behalf of the State of Massachusetts, by the terms of which the sachems, chiefs and warriors, for and in consideration of $48,216, then paid by Troup, Ogden & Rogers, the receipt whereof was acknowledged, granted and sold the same lands described in the prior conveyance to the grantees. Immediately after such treaty was made the Indians surrendered and abandoned possession of the land to such grantees, who soon thereafter, and before 1832, entered into the full and exclusive possession of it; and the possession of the land has ever since been held by them and their successive grantees of the parcels into which it has been divided, who have paid taxes assessed upon it. The defendant derived his title to the land in question

from the grantees of the treaty of 1826, having purchased in good faith and for a valuable consideration, and made valuable improvements upon it in reliance upon such title.

*Held*, that it was essential to the validity of the treaty and conveyance made in 1826, that it should be ratified by the senate of the United States, as required by an act of congress passed on March 30, 1802 (2 Rev. Stat. at Large, 143), which provides that no purchase "of any title or claim thereto from any Indian, or nation or tribe of Indians, within the bounds of the United States, shall be of any validity in law or equity unless the same be made by *treaty or convention entered into pursuant to the Constitution;* and it shall be a misdemeanor, in any person not employed under the authority of the United States, to negotiate such treaty or convention, directly or indirectly, to treat with any such Indian, nation or tribe of Indians, for the title, or purchase of any lands by them held or claimed." "Provided, nevertheless, that it shall be lawful for the agent or agents of any State, who may be present at any treaty held with Indians, under the authority of the United State, in the presence and with the approbation of the commissioner, or commissioners of the United States, appointed to hold the same, to propose to and adjust with the Indians the compensation to be made for their claims to lands within such State, which shall be extinguished by the treaty."

Of the purchase-money $43,050 represented by the stock in the public debt of the United States for that amount, bearing interest at the rate of six per cent per annum, was, by the grantees, deposited in the Ontario Bank, at Canandaigua, in trust for the Indians, upon which by it the interest was paid annually to and received by the Seneca Nation of Indians, until in the year 1855, when it was transferred to the treasury of the United States, pursuant to an act of congress of 1846, authorizing the president to receive the stock of the public debt, or moneys held by the bank in trust for the Senecas, whenever those Indians, or other persons whose consent might be necessary, should, in proper form, authorize the transfer, and to cause the stock to be canceled, and the amount of it, and of any moneys which he might so receive to be deposited in the treasury to the credit of those Indians, upon which amount interest at the rate of five per cent per annum should be paid to them until congress should direct the principal to be paid to the Indians. Such interest has since then, pursuant to that act, been paid to and received by the Seneca Nation.

*Held*, that the act of congress, providing for the governmental protection of the fund derived from the treaty of sale, for the benefit of the Indians, which was consummated, was entitled to and had the effect of a legislative adoption of the sale and purchase which the treaty purported to make.

That, even if that were not so, yet in view of the conceded fact that upon making the treaty the Indians surrendered and abandoned the possession of the lands to the owners of the right of pre-emption, and in view of the situation following it, and the facts before referred to bearing upon the relations assumed and recognized to exist, as well by government as by the parties to and represented in the treaty, the conclusion was permitted that there was an effectual abandonment of the lands embraced in it by the Indians, and that the purchase-money

agreed to be paid was taken, and it, or the most of it, was held by the government in lieu of such lands, in trust for the Indians.

That the title of the Indians was possessory and embraced the right of occupancy only, and that when abandoned by them the possession attached itself to the fee of the lands, and that at the time of such abandonment in this case the fee was in the persons composing the Ogden Land Company, under whom, through mesne conveyances, the defendant was in possession claiming title·

APPEAL from a judgment against the plaintiff, entered on a verdict rendered at the Erie Circuit.

*James C. Strong*, for the appellant.

*Norris Morey*, for the respondent.

BRADLEY, J.:

The action is ejectment, brought to recover the possession of a parcel of land formerly embraced within what was known as the Cattaraugus reservation, which, from time immemorial, was occupied by a portion of the Seneca Nation or tribe of Indians. The land in question is included in that part of western New York, which, prior to 1786, was the subject of controversy between this State and Massachusetts. In that year the adjustment of the matter resulted in a treaty of cession, entered into between those States, by which Massachusetts relinquished to the State of New York all claim to the government, sovereignty and jurisdiction over such territory, and the State of New York ceded, released and granted to Massachusetts the right of pre-emption of the soil from the native Indians and all other estate which the State of New York had in the land.

It was also provided by it that the commonwealth of Massachusetts might, from time to time, by persons authorized for that purpose, hold treaties and conferences with the native Indians relative to the property or right of soil of such lands, and might grant the right of pre-emption of the whole, or any part of them, to any person or persons, who, by virtue of such grant, should take and have the right to extinguish, by purchase, the claims of such Indians; provided, however, that no purchase from them, by any such grantees, should be valid unless made in the presence of and approved by a superintendent appointed for such purpose by the commonwealth of Massachusetts, and unless such purchase should be confirmed by that commonwealth.

In May, 1791, the State of Massachusetts conveyed its title and interest in lands, embracing that in question, to Robert Morris, from whom, by sundry mesne conveyances, the same was conveyed to persons constituting and known as the Holland Land Company, in 1801; and afterwards and prior to August, 1826, the same title, by mesne conveyances, was conveyed to Robert Troup, Thomas L. Ogden and Benjamin W. Rogers, commonly known as the Ogden Land Company. On August 31, 1826, a treaty or conveyance was made and executed by the "sachems, chiefs and warriors of the Seneca Nation of Indians, on behalf of such nation," with and to Troup, Ogden and Rogers, in the presence of Oliver Forward, commissioner appointed by the United States, and of Nathaniel Gorham, superintendent on behalf of the State of Massachusetts, by the terms of which the sachems, chiefs and warriors, for and in consideration of $48,216, to them in hand paid by Troup, Ogden & Rogers, the receipt whereof was acknowledged, "granted, bargained, sold, aliened, released, quit-claimed and confirmed to them the same lands particularly described as those embraced in the prior conveyance to the grantees. Immediately after such treaty was made, the Indians surrendered and abandoned the possession of the land to such grantees, who, soon thereafter and before 1832, entered into the full and exclusive possession of it, and the possession of the land has ever since been held by them and their successive grantees of the parcels into which it has been divided, who have paid taxes assessed upon it. The title under which the defendant claims was derived from the grantees of the treaty of 1826, and he and the various persons through whom he claims (like those who have purchased other portions of the tract) purchased in good faith and for valuable considerations, and, ever since about the year 1826, have occupied the land and made valuable improvements upon it in reliance upon such title.

It is clear that Troup and his associates had title to the lands, subject to right of the Indians, and had the right of pre-emption from them. But it is contended that the treaty of 1826, made with the Indians, was not effectual to convey their right or interest in the land, because the approval of it by the senate of the United States was essential to that result. This treaty of August, 1826, was transmitted to the senate in 1827, and in the year following a resolution

for its ratification was negatived. And soon after this the senate adopted a resolution, to the effect that by the refusal to ratify the treaty, it was not intended to express any disapprobation of the contract, but merely to disclaim the necessity of interference by the senate with the subject-matter.

The condition of pupilage or wardship of the Indians in this country has been recognized and observed by government. They have been deemed the rightful occupants of the soil and as having a just and legal claim to the possession and use of it until this right has in some manner been extinguished. This was the governmental theory before, as well as since, the American Revolution, although such humane considerations may not at all times have characterized the means employed in obtaining or taking from those natives the possession of lands occupied by them. And with a view to the protection of their rights in that respect, the means by which the release or extinguishment of such interest might be produced, has constantly been under the supervision of the sovereign or governmental power within which the lands are situated, and regulated by rules or laws emanating from it.

The treaty of 1783, with England, had the effect to vest in the people of the States, respectively, the fee which before was in the crown, of the lands within their limits, subject to the right then existing of the Indians to occupy the lands in their possession. And those States, respectively, then possessed the power to supervise and regulate the manner and method by which their right of occupancy might be released or extinguished. (*Johnson* v. *McIntosh*, 8 Wheat. 543 ; *Mitchel* v. *United States*, 9 Peters, 711.)

Inasmuch as the general government never had title to the lands within the thirteen original States, it is contended that it acquired no power to extinguish the Indian title within them, but that such power was exclusively under the control of the States in which was vested the ultimate fee. And reference is made to the remark of Mr. Justice BALDWIN, in *Mitchel* v. *United States* (*supra,* 748), that " it was a universal rule that purchases made at Indian treaties, in the presence and with the approbation of the officer under whose direction they were held, by the authority of the crown, gave a valid title to the lands ; it prevailed under the laws of the States after

the Revolution, and yet continues in those where the right to the ultimate fee is owned by the States or their grantees."

This power undoubtedly was exclusively in those States, respectively, prior to the adoption by them of the Constitution of the United States, before which time the treaty between the States of Massachusetts and New York was made, and after the adoption of such Constitution that treaty was duly ratified by the United States. If the means provided by that treaty for the extinguishment, by purchase of the Indian title, were adequately operative at the time the treaty of 1826 was made, the latter would seem to have been apparently effectual to produce such result, without the aid of any ratification of the senate of the United States, as the provision of the former treaty in that respect seems to have been observed in the making of the latter. At the time of the adoption of the Federal Constitution the ultimate fee of this land was in the commonwealth of Massachusetts, and by the adoption of such Constitution it surrendered to the congress of the general government the power " to regulate commerce with foreign nations and among the several States, and with the Indian tribes" (Const., art. 1, § 8), and to the president the power, by and with the advice and consent of the senate, to make treaties (id., art. 2. § 2) which should be the supreme law of the land. (Id., art. 6.) Since then the Indians, in the original, as well as in the other States and territories, have been treated as the wards of the general government, and the power of congress over the subject of their rights, and for the protection of them in their ancient possessions, is recognized ; their rights in that respect are deemed guaranteed to them by the federal government, and the power of the States to impair, or by legislation to permit, in any manner the extinguishment of the Indian title in aid of the owners of the right of pre-emption is denied to them. (*The New York Indians*, 5 Wall 761.)

The remark before mentioned of the learned justice in *Mitchel* v. *United States*, was designed as historical rather than judicial, as applied to that case ; and it may not be treated or adopted as the declaration of a legal rule in its application to the power of the States, there referred to, after the adoption of the Constitution. But, inasmuch as the treaty between Massachusetts and New York

was duly ratified by the United States, its provisions in that respect prescribed the manner in which it might effectually be done, and it was not impaired by the treaty of 1794, made between the United States and the Six Nations (of which the Seneca Nation was one), which, after reciting the boundaries of the lands occupied by the Seneca Nation, in which were embraced those covered by the treaty or conveyance of 1826, declared that the United States acknowledged the land within such boundaries to be the property of the Seneca Nation, that the United States would never claim it or disturb the Seneca Nation, nor any of the Six Nations, or any of their Indian friends residing thereon and united with them in the free use and enjoyment thereof, " but it shall remain theirs until they choose to sell the same to the people of the United States, who have the right to purchase." This right of pre-emption was in Troup and his associates in the treaty of 1826, at the time it was made, and they alone had the right to purchase from the Indians the land embraced in it.

We, therefore, think that such last mentioned treaty was effectual as a sale and purchase, unless to render it such something more was required by the act of congress of March 30, 1802, which provided that " no purchase, grant or lease or other conveyance of lands, or of any title or claim thereto from any Indian, or nation or tribe of Indians, within the bounds of the United States, shall be of any validity in law or equity unless the same be made by treaty or convention entered into pursuant to the Constitution, and it shall be a misdemeanor in any person, not employed under the authority of the United States, to negotiate such treaty or convention, directly or indirectly, to treat with any such Indian, nation or tribe of Indians, for the title or purchase of any lands by them held or claimed. \* \* \* Provided, nevertheless, that it shall be lawful for the agent or agents of any State, who may be present at any treaty held with Indians, under the authority of the United States, in the presence and with the approbation of the commissioner or commissioners of the United States, appointed to hold the same, to propose to and adjust with the Indians the compensation to be made for their claims to lands within such State, which shall be extinguished by the treaty." (2 U. S. Stat. at Large, 143; Brightly's Dig. 433.) The negotiation and making with the Indians of the treaty of August,

1826, came within the provisions of this proviso of that act, which seem to have been observed, as the treaty was attended by and had the approbation of a commissioner of the United States appointed for the purpose, and, pursuant to the laws of Massachusetts, by a superintendent appointed by that commonwealth. While the treaty was properly made with the Indians, the provision of the statute, that, for the purposes in view, it be entered into pursuant to the Constution, we think, was not modified or dispensed with by the proviso in the cases there referred to. While in the States the negotiation and treaty might be had and made with the Indians in the manner mentioned, the constitutional requirement was made applicable for the consummation of all treaties of that character. This construction is apparently within the purpose of the statute, and in harmony with the protecting policy of the general government in that respect. It seems, also, to be wisely so provided as a safeguard against possible abuse, prejudice and wrong, to which those people might otherwise be subjected, or suffer by the extinguishment, which they may have been induced to make or permit, of their interest in lands occupied by them. These views lead to the conclusion that ratification by the senate was essential to the treaty of 1802, and, therefore, the defense would fail if it depended solely upon such treaty and its effect as such. It may be that the senate had a different view of the construction of the statute of 1802, but the reasons for the last resolution adopted by the senators do not sufficiently appear to furnish any aid in the consideration of the question.

It appears that at the time the treaty was made the Indians were advised that their grantees had the right of pre-emption from them, and that they immediately surrendered and abandoned the possession to them of the lands described in it, and since then, until about the time of the commencement of this action, during the period of about sixty years, they in no manner asserted or made any claim to the land or the possession of it.

But, in view of the known habits of Indians, they may not be supposed to represent their occupation or possession by improvements or enclosures of all or great portion of their lands. They may use them, to considerable extent, for the purposes of roaming and hunting, more or less frequently, as they please. And what might appear to be a cessation of actual occupation and use, might

not necessarily be such an abandonment as would extinguish their right of occupancy, and support that of those having the fee of the lands; and, ordinarily, that question might be dependent upon a judicial determination in a proceeding or action having in its purpose and effect that of the common law writ of office. (3 Black. Com., 257, 258.) But in this case the abandonment and surrender were not only practically made, but have been characterized by such circumstances and by such recognition, not only by the Indians, but by the government, in such manner as to determine the situation and, in legal effect, to sever the prior relation of the Indians to the lands from them. The quantity of land covered by the treaty of conveyance was large. Those lands were surveyed and their boundaries plainly marked. Of the purchase-money, $43,050, represented by the stock in the public debt of the United States for that amount, bearing interest at the rate of six per cent per annum, was deposited by the grantees in the Ontario Bank at Canandaigua, in trust for the Indians, upon which by it the interest was paid annually to and received by the Seneca Nation of Indians until in the year 1855, when it was transferred to the treasury of the United States, pursuant to an act of congress of 1846, authorizing the president to receive the stock of the public debt or moneys held by the bank in trust for the Senecas, whenever those Indians, or other persons whose consent might be necessary, should, in proper form, authorize the transfer, and to cause the stock to be canceled, and the amount of it and of any moneys which he might so receive, to be deposited in the treasury to the credit of those Indians, upon which amount interest at the rate of five per cent per annum, should be paid to them, until congress should direct the principal to be paid to the Indians. Such interest has since then, pursuant to that act, been paid to and received by the Seneca Nation. This provision, made by the action of congress for the care of this fund and for the payment of interest upon it, and the observance of the statutory authority and direction following it, may be assumed to have been made and had with knowledge of the treaty of sale and purchase, by which the fund was produced; and they constitute something of a recognition of the treaty and of the apparent effect given to it. It also appears that treaties were made between the Seneca Indians and the United States in

the years 1838 and 1842, in which the estimated area of the Cattaraugus reservation was made, and such estimate did not include in it any of the lands covered by the treaty of August, 1826.

While it may be said, that ratification of what is unlawful may not be established by uncertain implication (*Cox* v. *Mayor*, 103 N. Y., 519), that proposition is not applicable to the question presented here. The treaty of 1826 apparently was not unlawful. It appears to have been lawfully conducted and made. And the only thing wanting to make it effectual was the approval by the senate, which seems to have been required by the act of 1802, before mentioned. The act of congress, providing for the governmental protection of the fund, derived from the treaty of sale, for the benefit of the Indians, which was consummated, goes far toward legislative adoption of the sale and purchase which the treaty purported to make, and we think it is entitled to and has that effect.

But, however, that may be, in view of the conceded fact that, upon making the treaty, the Indians surrendered and abandoned the possession of the lands to the owners of the right of pre-emption, and in view of the situation following it, and the facts before referred to, bearing upon the relations assumed and recognized to exist as well by government as by the parties to and represented in the treaty, the conclusion would seem to be permitted that there was an effectual abandonment of the lands embraced in it by the Indians, and that the purchase-money agreed to be and paid was taken, and it, or the most of it, held by the government in lieu of such lands, in trust for the Indians. We do not hold that the Indians would, by voluntary surrender merely, extinguish their title and thereby entitle those having the right of pre-emption from them, to appropriate the possession of such lands. That would have the effect to defeat the purpose and policy of government, but when by the legislative power of the government such voluntary action is recognized and treated as consistent with the interest of the Indians, and effectual, no reason now appears why it may not be deemed supported. The abandonment in question here was the result of a sale for a consideration paid, and has been so treated by congress and the constituted authorities of the United States for, at least, nearly forty years before the time of the commencement of this action, and in the meantime the lands, divided into farms, have

been the subject of sales, conveyances, cultivation and improvement upon the faith of the title so conveyed and taken, assured by an exclusive possession of sixty years, and founded, so far as related to the Indian title, upon the treaty of conveyance before mentioned, and on record in the county where the land is situated. The title of the Indians was possessory and embraced the right of occupancy only. And when abandoned by them the possession attached itself to the fee of the lands. (*Johnson* v. *McIntosh*, 8 Wheat., 543; *United States* v. *Cook*, 19 Wall., 591; *Beecher* v. *Wetherby*, 95 U. S., 517.) At the time of such abandonment the fee was in the persons composing the Ogden Land Company, under whom, through mesne conveyances, the defendant is in possession claiming title to the land in question.

The suggestion that the entire amount of the purchase-money was not paid, and that such fact is in the way of supporting the claim to the Indian title, is not sustained. We are not called upon to consider the effect of default in payment of any portion of the purchase-money. The treaty recites the payment of it, and as no such question seems ever before to have been raised, or full payment questioned, either by government or the Indians, it must at this late day be assumed, until the contrary is quite clearly made to appear, that the contract in that respect was performed.

The plaintiff, not being a corporation and having no such corporate name, could not, at common law, maintain an action. (*Strong* v. *Waterman*, 11 Paige, 607.) This right, however, was, more than forty years ago, conferred by statute, which, amongst other things, provides that the Seneca Nation of Indians may maintain an action of ejectment to recover the possession of any part of the Allegany and Cattaraugus reservations unlawfully withheld from them. (Laws of 1845, chap. 150, § 1; 4 Edm., 375.)

The further question presented, and by counsel discussed, is whether the statute of limitations is applicable, and a bar to the plaintiff's right of action. In the view taken the determination of that question is not essential; and for that reason it has received no consideration on this review.

The judgment should be affirmed.

Dwight, J., concurred; Barker, P. J., and Haight, J., not sitting.

Judgment affirmed.