72 U.S. 761 (____)
5 Wall. 761
THE NEW YORK INDIANS.
Supreme Court of United States.

*765 Mr. Martindale; Attorney-General of New York, for the appellees, and in support of the right to tax.
Mr. J.H. Reynolds, contra.
*766 Mr. Justice NELSON delivered the opinion of the court.
The principal authority to tax is derived from two acts of the legislature, passed May 9, 1840, and May 4, 1841. As the act of 1840 was held by the court below void as respects these reservations, we will, for the present, dismiss it.
The act of 1841 contains eight sections.
[His honor here stated the first five sections of the act in the words already given on pages 763-4.]
The eighth section provides that the taxes may be assessed, levied, and collected as directed by the act, notwithstanding the occupation of the lands by the Indians. The failure to extinguish the right of the Indians, or to remove them from the possession, shall not impair the validity of said taxes or prevent the collection.
This last section furnishes, doubtless, a solution of what we must otherwise regard as a very free, if not extraordinary, exercise of power over these reservations and the rights of the Indians, so long possessed and so frequently guaranteed by treaties. These treaties are historical and need not be referred to, beginning in 1784 and coming down to 1842. That of 1794, entered into at Canandaigua, New York, may be cited as a specimen. Third article, "The United States acknowledge all the land within the aforementioned boundaries (which include the reservations in question) to be the property of the Seneca nation, and the United States will never claim the same nor disturb the Seneca nation, ... *767 in the free use and enjoyment thereof; but it shall remain theirs until they choose to sell the same to the people of the United States, who have the right to purchase."
We will now refer to the explanation of this law, which, it is admitted, is the first (except that of 1840) ever passed by the legislature of New York to tax these Indian reservations.
By the treaty of 1838 the Seneca nation on these reservations agreed to remove to the west of the Mississippi River, and, at the same time, with the consent of the United States, sold their lands to Ogden & Fellows, who held the pre-emptive right, derived from Massachusetts, and executed a conveyance of the same. The treaty provided for the removal within five years. It was proclaimed April 4, 1840. Before the expiration of the five years, difficulties arose between the grantees and the Indians, which resulted in a new treaty, 20th May, 1842, between the United States and the Seneca nation, when it was agreed that the deed embracing these two reservations should be cancelled, and the Indians remain as before with all their original rights. The words are: "The said nation shall continue in the occupation and enjoyment of the whole of the said two several tracts of land, called the Cattaraugus reservation and the Alleghany reservation, with the same right and title in all things as they had and possessed therein immediately before the sale of said reservation."
Now, it will be seen that this act of New York, which was passed in 1841, was passed at a time when the grantees, under the treaty of 1838, had taken the title in fee, but before the expiration of the five years. And it was doubtless assumed, which we think a mistake, that the whole title being in the grantees, the State, notwithstanding the possession of the Indians, might enter upon the reservations in the exercise of its internal police powers, and deal with them as with any other portion of its territory. Hence the eighth section directing that taxes may be imposed, assessed, or levied and collected, notwithstanding the occupation of the Indians, or the failure to extinguish their right, or to remove them *768 from the possession, and declaring that the neglect should not impair the validity of the taxes or prevent the collection.
This explanation is due to the character of the State, and removes the inference that might otherwise be drawn, that the legislature were encouraging, if not authorizing, a direct interference by the owners of the right of pre-emption with these ancient possessions and occupations, secured by the most sacred of obligations of the Federal government.
It is provided, however, that the execution of these laws shall not disturb or affect the right of the Indians in their occupation of the reservations, and a clause in the fifth section is referred to as conclusive of this position. "But no sale for the purpose of collecting said taxes shall in any manner affect the right of the Indians to occupy said lands." It is true that this clause undertakes to save this right, which the act of 1840 did not; but the rights of the Indians do not depend on this or any other statutes of the State, but upon treaties, which are the supreme law of the land; it is to these treaties we must look to ascertain the nature of these rights, and the extent of them.
It has already been shown that the United States have acknowledged the reservations to be the property of the Seneca nation  that they will never claim them nor disturb this nation in their free use and enjoyment, and that they shall remain theirs until they choose to sell them. These are the guarantees given by the United States, and which her faith is pledged to uphold. Now we have seen that this law, taxing the lands in the reservations, authorizes the county authorities to enter upon them, survey and lay out roads, construct and repair them, construct and repair bridges, assess and collect taxes to meet the expenses, and survey the lands for the purpose of making the assessments, and in pursuance of these powers the proper officers of the counties have assessed upon them large sums for the years 1840, 1841, 1842, and 1843.
The answer to all this interference with the possession, and occupation, and exercise of authority is, that the sale *769 of the lands in default of payment of the taxes shall not "affect the right of occupancy of the Indians." We are of opinion that this is not a satisfactory answer.
We have looked through all the treaties from 1784 down to the present time, and find but one of them in which any right is stipulated to enter upon the lands reserved to construct roads. That is the treaty of 1794, in which the Seneca nation cede to the United States the right to make a wagonroad from Fort Schlosser to Lake Erie, as far south as Buffalo Creek.
A clause in the adjustment of the dispute between New York and Massachusetts, in respect to these and other lands, has been referred to, which provides that no general or State tax shall be charged or collected from the lands thereafter to be granted by Massachusetts, or on occupants or proprietors of such lands until fifteen years have elapsed after confirmation, &c., "but that the lands so granted, and the occupants thereof, shall, during the said period, be subject to town and county charges, or taxes only." We suppose this provision had no relation to the Indian occupation, or Indian occupants, for the two States possessed no power to deal with Indian rights or title. They were dealing exclusively with the pre-emption right after the Indian title was extinguished, and with the government and jurisdiction over the territory. The clause doubtless related to the condition of these lands in case the Indian title should be extinguished as to the whole or any part of them within the fifteen years' exemption. At all events, whatever may be the true construction, it can in no way affect the Indian occupants. The commissioners had no power over them.
The question of the taxation of Indian lands, while in their tribal organization, by the State authorities, has been before us this term in several cases from the State of Kansas, and after a very full consideration of the subject the power was denied.[*] We refer to the opinions in these cases as *770 rendering any further examination of the subject unnecessary.
The tax imposed on the Buffalo reservation in 1840, 1841, 1842, and 1843, is not distinguishable from that imposed on the Alleghany and Cattarangus reservations. The Indians were still in their ancient possessions and occupancy, and till removed by the United States were entitled to the undisturbed enjoyment of them.
On looking into the record it appears that these reservations, besides the special taxation referred to, have been taxed for the years 1840, 1841, 1842, and 1843, for the ordinary town and county charges in each year.
If I understand the opinion of the learned judge of the Court of Appeals, these taxes, as it respects the Buffalo reservation, are sustained on the ground that the Indians had parted with their title to Ogden & Fellows by the treaties and conveyances of 1838 and 1842, and that the whole title was in the grantees, though the period for the removal of the Indians had not expired, but would before the sales could take place for default in payment or the purchaser be entitled to the possession.
We have already given the answer which we think satisfactory to this ground in support of the judgment below. Until the Indians have sold their lands, and removed from them in pursuance of the treaty stipulations, they are to be regarded as still in their ancient possessions, and are in under their original rights, and entitled to the undisturbed enjoyment of them. This was the effect of the decision in the case of Fellows v. Blacksmith.[*] The time for the surrender of the possession, according to their consent given in the treaty, had not expired when these taxes were levied. The period within which the removal was to take place, under the treaty of 1838, was five years from the time it went into effect. It was not proclaimed till 1840, and under that of 1842 the time did not expire till 1846. The taxation of the lands was premature and illegal.
*771 It will be seen on looking into the general laws of the State imposing taxes for town and county charges, as well as into the special acts of 1840 and 1841, that the taxes are imposed upon the lands in these reservations, and it is the lands which are sold in default of payment. They are dealt with by the town and county authorities in the same way in making this assessment, and in levying the same, as other real property in these subdivisions of the State. We must say, regarding these reservations as wholly exempt from State taxation, and which, as we understand the opinion of the learned judge below, is not denied, the exercise of this authority over them is an unwarrantable interference, inconsistent with the original title of the Indians, and offensive to their tribal relations.
The tax titles purporting to convey these lands to the purchaser, even with the qualification suggested that the right of occupation is not to be affected, may well embarrass the occupants and be used by unworthy persons to the disturbance of the tribe. All agree that the Indian right of occupancy creates an indefeasible title to the reservations that may extend from generation to generation, and will cease only by the dissolution of the tribe, or their consent to sell to the party possessed of the right of pre-emption. He is the only party that is authorized to deal with the tribe in respect to their property, and this with the consent of the government. Any other party is an intruder, and may be proceeded against under the twelfth section of the act of 30th June, 1834.[*]
We are gratified to find that in 1857 the legislature of New York passed a law declaring, in substance, that no tax shall thereafter be assessed on either of the two reservations (Alleghany and Cattaraugus), or on any part of them, so long as they remain the property of the Seneca nation, and that all acts of the State conflicting with the provisions of this section are hereby repealed.[]
Our conclusion is, that the whole of the taxes assessed upon *772 the three reservations (Buffalo Creek, Alleghany, and Cattaraugus), are illegal, and void as in conflict with the tribal rights of the Seneca nation as guaranteed to it by treaties with the United States.
The judgment must therefore be REVERSED, and the cause remanded, with directions to enter a judgment IN CONFORMITY WITH THIS OPINION.
NOTES
[*] The Kansas Indians; supra, p. 737; the last preceding case.
[*] 19 Howard, 366.
[*] 4 Stat. at Large, 730.
[] 1 R.S.P., 907, § 10.