MONTANA ET AL. *v.* BLACKFEET TRIBE OF INDIANS

No. 83–2161.   Argued January 15, 1985—Reargued April 23, 1985—
Decided June 3, 1985

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, BLACKMUN, and O'CONNOR, JJ., joined. WHITE, J., filed a dissenting opinion, in which REHNQUIST and STEVENS, JJ., joined, *post*, p. 768.

*Deirdre Boggs,* Special Assistant Attorney General of Montana, reargued the cause for petitioners. With her on the briefs were *Michael T. Greely,* Attorney General, *Chris D. Tweeten,* Assistant Attorney General, and *Helena S. Maclay,* Special Assistant Attorney General.

*Jeanne S. Whiteing* reargued the cause for respondent. With her on the brief was *Richard B. Collins.*

*Edwin S. Kneedler* reargued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Lee, Assistant Attorney General Habicht, Deputy Solicitor General Claiborne,* and *Martin W. Matzen.**

---

*Briefs of *amici curiae* urging affirmance were filed for Cotton Petroleum Corp. et al. by *Daniel H. Israel* and *Scott B. McElroy;* for the Assiniboine and Sioux Tribes of the Fort Peck Reservation el al. by *Harry R. Sachse, Kevin A. Griffin, Thomas Acevedo, Arthur Lazarus, Jr.,* and *W. Richard West, Jr.;* for the Crow Tribe of Indians by *Robert S. Pelcyger.*

Briefs of *amici curiae* were filed for the State of California by *John K. Van de Kamp,* Attorney General, and *Timothy G. Laddish* and *Julian O. Standen,* Deputy Attorneys General; for the State of New Mexico et al. by *Paul Bardacke,* Attorney General of New Mexico, and *Paula Forney-Thompson* and *Frank D. Katz,* Special Assistant Attorneys General, *Robert K. Corbin,* Attorney General of Arizona, and *Anthony Ching,* Solicitor General, *Norman C. Gorsuch,* Attorney General of Alaska, *John K. Van de Kamp,* Attorney General of California, *Richard D. Martland,* Chief Assistant Attorney General, *Arthur C. De Goede,* Assistant Attorney General, and *James B. Cuneo,* Deputy Attorney General, *Jim Jones,* Attorney General of Idaho, and *Robie G. Russell,* Assistant Attorney General, *David L. Wilkinson,* Attorney General of Utah, *Dallin W. Jensen,* Solicitor General, and *Michael M. Quealy,* Assistant Attorney General, and *A. G. McClintock,* Attorney General of Wyoming.

JUSTICE POWELL delivered the opinion of the Court.

This case presents the question whether the State of Montana may tax the Blackfeet Tribe's royalty interests under oil and gas leases issued to non-Indian lessees pursuant to the Indian Mineral Leasing Act of 1938, ch. 198, 52 Stat. 347, 25 U. S. C. § 396a *et seq.* (1938 Act).

I

Respondent Blackfeet Tribe filed this suit in the United States District Court for the District of Montana challenging the application of several Montana taxes[1] to the Tribe's royalty interests in oil and gas produced under leases issued by the Tribe. The leases involved unallotted lands on the Tribe's reservation and were granted to non-Indian lessees in accordance with the 1938 Act. The taxes at issue were paid to the State by the lessees and then deducted by the lessees from the royalty payments made to the Tribe. The Blackfeet sought declaratory and injunctive relief against enforcement of the state tax statutes.[2] The Tribe argued to the District Court that the 1938 Act did not authorize the State to tax tribal royalty interests and thus that the taxes were unlawful. The District Court rejected this claim and

---

[1] At issue are the taxes adopted in the following statutes: the Oil and Gas Severance Tax, Mont. Code Ann. § 15–36–101 *et seq.* (1983); Oil and Gas Net Proceeds, Mont. Code Ann. § 15–23–601 *et seq.* (1983); Oil and Gas Conservation, Mont. Code Ann. § 82–11–101 *et seq.* (1983); and the Resource Indemnity Trust Tax, Mont. Code Ann. § 15–38–101 *et seq.* (1983).

[2] The Blackfeet properly invoked the jurisdiction of the District Court pursuant to 28 U. S. C. § 1362, which provides:

"The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."

As we ruled in *Moe* v. *Salish & Kootenai Tribes,* 425 U. S. 463 (1976), a suit by an Indian tribe to enjoin the enforcement of state tax laws is cognizable in the district court under § 1362 despite the general ban in 28 U. S. C. § 1341 against seeking federal injunctions of such laws. See *id.,* at 474–475.

granted the State's motion for summary judgment. The court held that the state taxes were authorized by a 1924 statute, Act of May 29, 1924, ch. 210, 43 Stat. 244, 25 U. S. C. § 398 (1924 Act), and that the 1938 Act, under which the leases in question were issued, did not repeal this authorization. The District Court was not persuaded by a 1977 opinion of the Department of the Interior supporting the Blackfeet's position, noting that the Department previously had expressed contrary views, 507 F. Supp. 446, 451 (1981).

A panel of the United States Court of Appeals for the Ninth Circuit affirmed the District Court's decision. On rehearing en banc, the Court of Appeals reversed in part and remanded the case for further proceedings. 729 F. 2d 1192 (1984). The court held that the tax authorization in the 1924 Act was not repealed by the 1938 Act and thus remained in effect for leases executed pursuant to the 1924 Act. The court also held, however, that the 1938 Act did not incorporate the tax provision of the 1924 Act, and therefore that its authorization did not apply to leases executed after the enactment of the 1938 Act. The court reasoned that the taxing provision of the 1924 Act was inconsistent with the policies of the Indian Reorganization Act of 1934, 48 Stat. 984, 25 U. S. C. § 461 *et seq.* (IRA). Since the 1938 Act was adopted specifically to harmonize Indian leasing laws with the IRA, Congress could not have intended the 1924 Act to apply to leases issued under the 1938 Act. The court remanded the case to the District Court to determine where the legal incidence of the taxes fell, and directed the court to consider whether, if the taxes fell on the oil and gas producers instead of the Indians, the taxes were pre-empted by federal law. We granted the State's petition for certiorari to resolve whether Montana may tax Indian royalty interests arising out of leases executed after the adoption of the 1938 Act. 469 U. S. 815 (1984). We affirm the decision of the en banc Court of Appeals that it may not.

## II

Congress first authorized mineral leasing of Indian lands in the Act of Feb. 28, 1891, 26 Stat. 795, 25 U. S. C. § 397 (1891 Act). The Act authorized leases for terms not to exceed 10 years on lands "bought and paid for" by the Indians. The 1891 Act was amended by the 1924 Act. The amendment provided in pertinent part:

> "Unallotted land . . . subject to lease for mining purposes for a period of ten years under section 397 . . . may be leased . . . by the Secretary of the Interior, with the consent of the [Indian] council . . . , for oil and gas mining purposes for a period of not to exceed ten years, and as much longer as oil or gas shall be found in paying quantities, and the terms of any existing oil and gas mining lease may in like manner be amended by extending the term thereof for as long as oil or gas shall be found in paying quantities: *Provided,* That the production of oil and gas and other minerals on such lands may be taxed by the State in which said lands are located in all respects the same as production on unrestricted lands, and the Secretary of the Interior is authorized and directed to cause to be paid the tax so assessed against the royalty interests on said lands: *Provided, however,* That such tax shall not become a lien or charge of any kind or character against the land or the property of the Indian owner." Act of May 29, 1924, ch. 210, 43 Stat. 244, 25 U. S. C. § 398.

Montana relies on the first proviso in the 1924 Act in claiming the authority to tax the Blackfeet's royalty payments.

In 1938, Congress adopted comprehensive legislation in an effort to "obtain uniformity so far as practicable of the law relating to the leasing of tribal lands for mining purposes." S. Rep. No. 985, 75th Cong., 1st Sess., 2 (1937) (hereafter Senate Report). Like the 1924 Act, the 1938 Act permitted,

subject to the approval of the Secretary of the Interior, mineral leasing of unallotted lands for a period not to exceed 10 years and as long thereafter as minerals in paying quantities were produced. The Act also detailed uniform leasing procedures designed to protect the Indians. See 25 U. S. C. §§ 396b–396g. The 1938 Act did not contain a provision authorizing state taxation; nor did it repeal specifically the authorization in the 1924 Act. A general repealer clause was provided in § 7 of the Act: "All Act [sic] or parts of Acts inconsistent herewith are hereby repealed." The question presented by this case is whether the 1924 Act's proviso that authorizes state taxation was repealed by the 1938 Act, or if left intact, applies to leases executed under the 1938 Act.

## III

The Constitution vests the Federal Government with exclusive authority over relations with Indian tribes. Art. I, § 8, cl. 3; see *Oneida Indian Nation* v. *County of Oneida*, 414 U. S. 661, 670 (1974), citing *Worcester* v. *Georgia*, 6 Pet. 515, 561 (1832). As a corollary of this authority, and in recognition of the sovereignty retained by Indian tribes even after formation of the United States, Indian tribes and individuals generally are exempt from state taxation within their own territory. In *The Kansas Indians*, 5 Wall. 737 (1867), for example, the Court ruled that lands held by Indians in common as well as those held in severalty were exempt from state taxation. It explained that "[i]f the tribal organization . . . is preserved intact, and recognized by the political department of the government as existing, then they are a 'people distinct from others,' . . . separated from the jurisdiction of [the State], and to be governed exclusively by the government of the Union." *Id.*, at 755. Likewise, in *The New York Indians*, 5 Wall. 761 (1867), the Court characterized the State's attempt to tax Indian reservation land as extraordinary, an "illegal" exercise of state power, *id.*, at 770, and "an unwarrantable interference, inconsistent with the original

title of the Indians, and offensive to their tribal relations," *id.*, at 771. As the Government points out, this Court has never wavered from the views expressed in these cases. See, *e. g.*, *Bryan* v. *Itasca County*, 426 U. S. 373, 375–378, 392–393 (1976); *Moe* v. *Salish & Kootenai Tribes*, 425 U. S. 463, 475–476 (1976); *Mescalero Apache Tribe* v. *Jones*, 411 U. S. 145, 148 (1973).

In keeping with its plenary authority over Indian affairs, Congress can authorize the imposition of state taxes on Indian tribes and individual Indians. It has not done so often, and the Court consistently has held that it will find the Indians' exemption from state taxes lifted only when Congress has made its intention to do so unmistakably clear. *E. g.*, *Bryan* v. *Itasca County*, *supra*, at 392–393; *Carpenter* v. *Shaw*, 280 U. S. 363, 366–367 (1930). The 1924 Act contains such an explicit authorization. As a result, in *British-American Oil Producing Co.* v. *Board of Equalization of Montana*, 299 U. S. 159 (1936), the Court held that the State of Montana could tax oil and gas produced under leases executed under the 1924 Act.[3]

The State urges us that the taxing authorization provided in the 1924 Act applies to leases executed under the 1938 Act as well. It argues that nothing in the 1938 Act is inconsistent with the 1924 taxing provision and thus that the provision was not repealed by the 1938 Act. It cites decisions of this Court that a clause repealing only inconsistent Acts "implies very strongly that there may be acts on the same subject which are not thereby repealed," *Hess* v. *Reynolds*, 113 U. S. 73, 79 (1885), and that such a clause indicates Congress' intent "to leave in force some portions of former acts relative to the same subject-matter," *Henderson's Tobacco*, 11 Wall.

---

[3] In *British-American Oil Producing Co.* v. *Board of Equalization of Montana,* the Court interpreted the statutory leasing authority over lands "bought and paid for by the Indians" to include land reserved for the Indians in exchange for their cession or surrender of other lands or rights, as well as that acquired by Indians for money.

652, 656 (1871). The State also notes that there is a strong presumption against repeals by implication, *e. g.*, *United States* v. *Borden Co.*, 308 U. S. 188, 198 (1939), especially an implied repeal of a specific statute by a general one, *Morton* v. *Mancari*, 417 U. S. 535, 550–551 (1974). Thus, in the State's view, sound principles of statutory construction lead to the conclusion that its taxing authority under the 1924 Act remains intact.

The State fails to appreciate, however, that the standard principles of statutory construction do not have their usual force in cases involving Indian law. As we said earlier this Term, "[t]he canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians." *Oneida County* v. *Oneida Indian Nation*, 470 U. S. 226, 247 (1985). Two such canons are directly applicable in this case: first, the States may tax Indians only when Congress has manifested clearly its consent to such taxation, *e. g.*, *Bryan* v. *Itasca County*, *supra*, at 393; second, statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit, *e. g.*, *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S. 164, 174 (1973); *Choate* v. *Trapp*, 224 U. S. 665, 675 (1912).[4] When the 1924 and 1938 Acts are considered in light of these principles, it is clear that the 1924 Act does not authorize Montana to enforce its tax statutes with respect to leases issued under the 1938 Act.

## IV

Nothing in either the text or legislative history of the 1938 Act suggests that Congress intended to permit States to tax tribal royalty income generated by leases issued pursuant to that Act. The statute contains no explicit consent to state

---

[4] Indeed, the Court has held that although tax exemptions generally are to be construed narrowly, in "the Government's dealings with the Indians the rule is exactly the contrary. The construction, instead of being strict, is liberal . . . ." *Choate* v. *Trapp*, 224 U. S., at 675.

taxation. Nor is there any indication that Congress intended to incorporate implicitly in the 1938 Act the taxing authority of the 1924 Act.[5] Contrary to the State's suggestion, under the applicable principles of statutory construction, the general repealer clause of the 1938 Act cannot be taken to incorporate consistent provisions of earlier laws. The clause surely does not satisfy the requirement that Congress clearly consent to state taxation. Nor would the State's interpretation satisfy the rule requiring that statutes be construed liberally in favor of the Indians.

Moreover, the language of the taxing provision of the 1924 Act belies any suggestion that it carries over to the 1938 Act.[6] The tax proviso in the 1924 Act states that "the production of oil and gas and other minerals on such lands may be taxed by the State in which said lands are located . . . ." 25 U. S. C. § 398. Even applying ordinary principles of statutory construction, "such lands" refers to "[u]nallotted land . . . subject to lease for mining purposes . . . under section 397 [the 1891 Act]." When the statute is "liberally

---

[5] In fact, the legislative history suggests that Congress intended to replace the 1924 Act's leasing scheme with that of the 1938 Act. As the Court of Appeals recognized, Congress had three major goals in adopting the 1938 Act: (i) to achieve "uniformity so far as practicable of the law relating to the leasing of tribal lands for mining purposes," Senate Report 2; H. R. Rep. No. 1872, 75th Cong., 3d Sess., 1 (1938); (ii) to "bring all mineral-leasing matters in harmony with the Indian Reorganization Act," Senate Report 3; H. R. Rep. No. 1872, supra, at 3; and (iii) to ensure that Indians receive "the greatest return from their property," Senate Report 2; H. R. Rep. No. 1872, supra, at 2. As the Court of Appeals suggested, these purposes would be undermined if the 1938 Act were interpreted to incorporate the taxation proviso of the 1924 Act. See 729 F. 2d 1192, 1196–1198 (CA9 1984).

[6] The Court of Appeals held that the 1938 Act did not repeal implicitly the 1924 consent to state taxation and thus that this consent continues in force with respect to leases issued under the 1924 or 1891 Acts. Id., at 1200. Because the Blackfeet have not sought review on this question, we need not decide whether the Court of Appeals was correct. We assume for purposes of this case that the 1924 Act's authorization remains in effect for leases executed pursuant to that statute.

construed . . . in favor of the Indians," *Alaska Pacific Fisheries* v. *United States*, 248 U. S. 78, 89 (1918), it is clear that if the tax proviso survives at all, it reaches only those leases executed under the 1891 Act and its 1924 amendment.[7]

## V

In the absence of clear congressional consent to taxation, we hold that the State may not tax Indian royalty income from leases issued pursuant to the 1938 Act. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE WHITE, with whom JUSTICE REHNQUIST and JUSTICE STEVENS join, dissenting.

The question is whether the proviso to the Act of May 29, 1924, ch. 210, 43 Stat. 244, 25 U. S. C. § 398, authorizes a

---

[7] We are likewise unpersuaded by the State's contention that we should defer to the administrative interpretation that the 1924 taxing proviso applies to leases executed under the 1938 Act. The State relies on opinions of the Department of the Interior in making this argument. As the Court of Appeals pointed out, however, the administrative record is not as strongly consistent as the State contends. *Id.*, at 1202–1203. The opinions issued prior to 1956 did not mention the 1938 Act or leases executed pursuant thereto. Thus, at best, they did not address the issue presented by this case, but simply assumed that the 1924 Act and this Court's decision in *British-American Oil Producing Co.* v. *Board of Equalization of Montana*, 299 U. S. 159 (1936), applied to leases executed under the 1938 Act. It was not until its 1956 opinion that the Department of the Interior considered the relationship between the 1938 and 1924 Acts. The Department then held that the taxing provision had not been repealed by the 1938 Act. This 1956 opinion was unpublished and did not analyze whether Congress had intended the 1924 Act's provision to apply to leases entered pursuant to the 1938 Act. A 1966 opinion relied on the 1956 opinion. In 1977, the Department reconsidered the issue carefully and in far greater detail than it had in 1956, and reversed its prior decision. See 729 F. 2d, at 1202–1203. On this record, we cannot accept the premise of the State's argument for deference to agency interpretation, that is, that the Department had a *consistent* 40-year practice. This is particularly true where, as here, the language and purpose of the 1938 Act are—for the reasons set forth above—clearly to the contrary.

State to tax oil and gas production under leases entered into under the Indian Mineral Leasing Act of 1938, ch. 198, 52 Stat. 347, 25 U. S. C. §§ 396a–396g. In my view, the proviso constitutes a sufficiently explicit expression of congressional intent to permit such taxation.

The majority apparently does not rest its contrary holding on the conclusion that the 1938 Act *repealed* the taxing authority contained in the 1924 Act. Although the majority does not appear to come to rest on the question whether the taxing proviso has been repealed, it is clear to me (as it was to both the majority and the dissent in the Court of Appeals) that the 1938 Act did not repeal the proviso. The 1938 Act repealed only Acts inconsistent with its terms, see ch. 198, § 7, 52 Stat. 347, and there is no suggestion that taxation of mineral leases is actually inconsistent with any of the provisions of the 1938 Act. Indeed, given that the 1938 Act and its legislative history are completely silent on the question of taxation, it cannot seriously be suggested that the 1938 Act specifically repealed any taxing authority that might otherwise exist under the 1924 Act.

The question thus boils down to whether the taxing proviso, by its terms, applies to leases under the 1938 Act.* The answer must be sought in the terms of the proviso itself. The majority concludes that the 1924 Act cannot be read to apply to leases under the 1938 Act. I must disagree.

The proviso to the 1924 Act states that "the production of oil and gas and other minerals *on such lands* may be taxed by the State in which said lands are located in all respects the same as production on unrestricted lands" (emphasis added). The permission to tax in the proviso depends only on the

---

*The majority frames the question as whether the 1938 Act "incorporate[s]" the proviso to the 1924 Act. See *ante*, at 767. To me, the discussion of "incorporation" seems beside the point. The 1924 proviso remains on the books, and it covers leases of a certain description. The question is whether leases under the 1938 Act fit that description. If they do, a specific congressional intent to "incorporate" the proviso into the 1938 Act is unnecessary.

character of the lands on which production takes place; accordingly, the dispositive question here is whether the lands the Blackfeet have leased under the 1938 Act are "such lands" within the meaning of the proviso.

The phrase "such lands" in the proviso refers to "[u]nallotted land on Indian reservations other than lands of the Five Civilized Tribes and the Osage Reservation subject to lease for mining purposes for a period of ten years under the proviso to section 3 of the Act of February 28, 1891 [ch. 383, § 3, 26 Stat. 795]." The 1891 Act, now codified at 25 U. S. C. § 397, allowed mineral leasing of "lands . . . occupied by Indians who have bought and paid for the same, and which lands are not needed for farming or agricultural purposes, and are not desired for individual allotments." Thus, the proviso by its express terms applies to unallotted lands on Indian reservations "bought and paid for" by the Indians and not needed for agricultural purposes.

The lands that the Blackfeet have leased under the 1938 Act clearly fall within this description: they are unallotted reservation lands not needed for agricultural purposes. Moreover, in *British-American Oil Producing Co.* v. *Board of Equalization of Montana,* 299 U. S. 159 (1936), this Court held that the Blackfeet Reservation was "bought and paid for" within the meaning of the proviso—that is, the reservation is the product of an agreement by which the Blackfeet gave up certain rights in exchange for the reservation. See *id.,* at 162–164. Because the leases are located "on such lands" as are described by the 1924 proviso, I can only conclude that the taxation of oil and gas production under the leases is expressly authorized by the proviso and is therefore lawful.

In so concluding, I am mindful of the general rule that statutes are to be liberally construed in favor of Indian tribes. But more to the point, to my way of thinking, is the proposition that this rule is no more than a canon of construction, and "[a] canon of construction is not a license to disregard

clear expressions of . . . congressional intent." *Rice* v. *Rehner*, 463 U. S. 713, 733 (1983). The proviso to the 1924 Act is a clear expression of congressional intent to allow the States to tax mineral production under leases of lands described in the Act; the proviso has never been repealed; and the lands that the Blackfeet have leased under the 1938 Act fall within the proviso's description of lands on which mineral production is subject to taxation.

Respondent suggests, and the majority seems to agree, see *ante*, at 767, n. 5, that this result is to be avoided because state taxation of mineral production on leaseholds created under the 1938 Act is somehow contrary to the "policy" of the 1938 Act. The relevant policies seem to have been promoting uniformity in the law governing tribal authority to enter into mineral leases, preserving the independence of Indian tribes, and guaranteeing the tribes a fair return on properties leased for mineral production. But it is far from clear that Congress saw state taxation of mineral production to be a threat to any of these goals; as the majority concedes, the legislative history is barren of any indication that taxation by the States was one of the evils Congress sought to eradicate through the 1938 Act. This omission is particularly striking given that at the time the statute was under consideration, this Court had just handed down its ruling in *British-American Oil Producing Co.*, *supra*, which held that production on leases located on reservations created by treaty or legislation was subject to state taxation under the proviso to the 1924 Act. To me, the absence of any comment in the legislative history pertaining to state taxation confirms that we should give effect to the express language of the 1924 proviso authorizing the state taxes at issue here.

Finally, I consider it relevant, though not dispositive, that the suggestion that the 1924 Act does not authorize taxation of production on 1938 Act leases is contrary to the interpretation of both Acts that apparently prevailed in the Department of the Interior until 1977. Opinions issued by the

Office of the Solicitor of the Interior in the years following the passage of the 1938 Act discussed the scope of state authority to tax under the proviso to the 1924 Act with no mention of the possibility that the 1938 Act had had any effect on such authority. See 58 I. D. 535 (1943); Opinion of the Department of Interior, M–36246, Oct. 29, 1954, 2 Op. Solicitor of Dept. of Interior Relating to Indian Affairs 1917–1974, p. 1652 (1979); Opinion of the Department of Interior, M–36310, Oct. 13, 1955. In 1956, the Department issued an opinion explicitly concluding that the 1924 proviso applied to leases under the 1938 Act, and the Department reaffirmed this position in 1966. See Opinion of the Department of Interior, M–36345, May 4, 1956; Letter from Harry R. Anderson, Asst. Secretary of the Interior, Oct. 27, 1966, reprinted at App. to Pet. for Cert. 301. Not until 1977 did the Department change its view of the effect of the 1938 Act on the taxation authority contained in the proviso. This history admittedly does not conclusively establish what the Department's position was at the time of the passage of the 1938 Act and in the years immediately following. Still, it is significant that it was not until years after the passage of the 1938 Act that the Department first suggested that the 1924 proviso's explicit authorization of taxation did not extend to leases under the 1938 Act. Had Congress really intended to cut off the State's authority to tax mineral production on all leases entered into after 1938, it would seem odd that no one in the Interior Department was aware of this intention.

Because the proviso to the 1924 Act explicitly authorizes state taxation of mineral production on "such lands" as are concerned in this case, and because nothing in the language of the 1938 Act, its legislative history, its underlying policies, or its administrative construction suggests that the express language of the proviso should not govern this case, I would hold that the state taxes at issue here are authorized by federal law.

I therefore dissent.