[No. C057638. Third Dist. June 20, 2008.]

In re BRANDON T., a Person Coming Under the Juvenile Court Law.
SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN
SERVICES, Plaintiff and Respondent, v.
CARMELLA M., Defendant and Appellant.

**COUNSEL**

Janet H. Saalfield, under appointment by the Court of Appeal, for Defendant and Appellant.

Robert A. Ryan, Jr., County Counsel, and Lilly C. Frawley, Deputy County Counsel, for Plaintiff and Respondent.

**OPINION**

**ROBIE, J.**—Appellant, the mother of the minor, appeals from the juvenile court's order terminating her parental rights. (Welf. & Inst. Code,[1] §§ 366.26, 395.) Appellant claims there was insufficient evidence to support the court's finding that the minor was adoptable. She also maintains the court made numerous errors in applying the provisions of the Indian Child Welfare Act of 1978 (ICWA). (25 U.S.C. § 1901 et seq.) We shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 2005, the Sacramento County Department of Health and Human Services (the department) filed a dependency petition concerning the newborn minor alleging that he and appellant both tested positive for methamphetamine at the time of the minor's birth and that the minor suffered withdrawal symptoms. The petition further alleged appellant had previously given birth to two other children with positive toxicology screens for methamphetamine and that her reunification services and parental rights with these and two other children were terminated in 1998. According to the jurisdictional report, three of appellant's other children had suffered injuries consistent with nonaccidental trauma, such as burns and bruises caused by a belt, when they were all under the age of four. Finally, it was alleged that appellant suffered from mental health problems rendering her incapable of caring for the minor, which problems included a history of hallucinations and diagnoses of bipolar, schizoaffective, and depressive disorders.

According to the jurisdictional report, appellant, who was 30 years old, admitted she began using methamphetamine at age 17 or 18 and had been in five previous treatment programs. She acknowledged she had five drug-related misdemeanor convictions and was a registered drug offender. In addition, appellant was taking medication for her mental health disorders.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

The father, who had been in recovery from alcoholism for three years and occasionally used marijuana, informed the social worker that he was not interested in reunification services and that he wanted his parents to have custody of the minor. Both parents were referred to substance abuse services prior to the jurisdictional hearing.

At the detention hearing, appellant disclosed she might have "Redfoot" or "Whitefoot" Indian heritage. The father claimed possible heritage through the Athabaskan Indians. The department was ordered to investigate and provide notice to these tribes, if they were determined to be federally recognized, in compliance with the ICWA.

According to the department's paralegal, the maternal grandmother claimed possible ancestry with the "Redfoot," which is not a federally recognized tribe. The maternal grandmother also stated she had " 'a little bit' of Apache ancestry" from her maternal grandmother, whose name she did not know, and that the maternal great-grandfather also had Apache ancestry. She provided the names and birth dates of the maternal great-grandfather's parents.

The paralegal's research indicated that "Athabaskan" was not a tribe but, rather, a linguistic group. However, the paternal grandmother reported that the paternal grandfather was affiliated with the Arctic Village in Alaska, one of four residences of the Native Village of Venetie (Venetie). The paternal grandmother provided a certificate of degree of Indian blood for the father and paternal grandfather establishing that the paternal grandfather was full-blooded Venetie and the father was one-half Venetie.

Eight Apache tribes and the Venetie were served with an ICWA notice, as was the Bureau of Indian Affairs (BIA). All of the Apache tribes responded that the minor was not a member or eligible for membership. Initially, no written response was received from the Venetie. However, the social worker spoke with an ICWA worker from the Venetie, who inquired about the minor's placement. The social worker attempted to find a placement for the minor through two Indian agencies but was informed there were no available foster homes. Placement with the paternal grandparents was also explored, but it was determined that, contrary to what the paternal grandmother had told the social worker, she had allowed appellant to stay at the home.

A report prepared by an ICWA expert Nanette L. Gledhill was submitted to the court. Gledhill had reviewed the court reports and spoken with the social worker, the father and the paternal grandmother, but she had not been successful in her efforts to contact the Venetie and appellant. Gledhill concluded that continued care of the minor by appellant or the father was

likely to result in serious emotional or physical damage to the minor and that "active efforts" had been made as to appellant. The father had changed his mind and was now requesting reunification services, and it was Gledhill's opinion that the father should be offered services because "an active efforts showing ha[d] not been made" as to him. Gledhill also noted that the minor's placement did not meet the ICWA placement requirements.

Neither parent was present at the jurisdictional hearing, which went forward in December 2005. According to reports filed by the social worker, the parents had not participated in services or visited the minor consistently. The juvenile court found by clear and convincing evidence that continued custody with the parents was likely to cause the minor serious emotional damage and that active efforts had been made to provide services designed to prevent the breakup of the Indian family. The court denied reunification services to appellant pursuant to section 361.5, subdivision (b)(10) (parent has not made a reasonable effort to treat problem leading to removal of a sibling with whom parent failed to reunify), (11) (parent has not made a reasonable effort to treat problem leading to removal of a sibling and parental rights severed as to sibling), and (13) (parent has extensive history of drug abuse and has resisted treatment), but offered services to the father.

According to the report for the six-month review hearing, the father had not participated in services and had visited the minor only four times. The social worker made numerous attempts to meet with the father, to no avail. Appellant had not visited the minor. The social worker recommended the father's services be terminated.

Notice of the six-month review hearing was sent to the Venetie and the BIA. At the review hearing in May 2006, the juvenile court terminated reunification services and set the matter for a hearing pursuant to section 366.26 to select and implement a permanent plan for the minor. The court ordered the department to serve an amended "Notice of Involuntary Child Custody Proceedings for an Indian Child" notice "as to the . . . father," and notice again was sent to the Venetie.

According to the report for the section 366.26 hearing, the minor was exhibiting some delays and had been accepted for services at the Alta California Regional Center. According to a later assessment, the minor showed borderline functioning in language development and motor skills, although his cognitive functioning was otherwise in the average range. Otherwise, the minor was in good health and "present[ed] as a very happy child." His foster parents wanted to adopt him and were in the process of completing a home study.

In the meantime, a letter from the Venetie in August 2006 stated that the minor was a tribal member. The Venetie subsequently filed a motion to intervene, which was granted.

The department submitted an updated report from Gledhill, who again had been unable to make contact with a representative of the Venetie. According to Gledhill, out-of-home care for the minor was necessary and continued care in the parents' custody was likely to result in serious emotional or physical damage to the minor. It was Gledhill's opinion that active efforts had been made by the department to provide services designed to prevent the breakup of the Indian family. However, according to Gledhill, the department had not established that they had made a diligent search for a placement in compliance with the preferences set forth in the ICWA.

The social worker, with the assistance of an ICWA expert and a placement coordinator, reviewed approved home studies of families from numerous agencies and contacted several Indian adoption facilitators, but no Indian families were found that could meet "the specific needs of the [minor]," which included "global delays"[2] and appellant's mental health problems.

While the section 366.26 hearing was pending, appellant filed three requests for modification seeking reunification services or return of the minor and alleging that she had participated in mental health, parenting, and substance abuse services and was "medication compliant." The first two requests were denied without a hearing, and the third request was denied after a hearing, based on the juvenile court's finding that appellant had not demonstrated consistency in her sobriety.

The Venetie participated in the section 366.26 hearing, which occurred in December 2006. At the conclusion of the hearing, the juvenile court ordered the minor to be moved to the home of extended family members who were willing to adopt him and identified placement with these relatives as the permanent plan.

According to a progress report in March 2007, the minor had moved into the home of the relatives in late December and appeared to be adjusting well to the placement.[3] The relatives had two adult children whom they had adopted and, according to the report, were capable of meeting the minor's needs. The Venetie and the minor's father supported the plan of adoption by the relatives.

---

[2] Global delays implies that a child has delayed achievement in all areas of development.

[3] The date of placement with the relatives was reported at various times as January 2007, February 2007, and early December 2006.

According to a postpermanency review report filed in June 2007, the relative caretakers were working with their county of residence to obtain a home study and had applied for "special needs assistance." The minor continued to be in good health but was enrolled in "Early Intervention Services" and was still described as having "global delays."

A selection and implementation report filed in September 2007 stated that the minor was bonded with the relative caretakers. It was reported that he continued to have "global delays," and the relative caretakers were concerned that he had "some autistic-like features." The minor was receiving physical therapy, speech therapy, and occupational therapy, and he continued to have some gross motor skills difficulties.

A new report from Gledhill confirmed her previous opinion that care of the minor by the parents would likely result in serious emotional or physical damage to the minor.

At the request of the department, a new section 366.26 hearing was scheduled and, after numerous continuances, the hearing went forward in November 2007. Appellant was not present. According to the Venetie's representative, the Venetie did not object to termination of parental rights and supported the minor's placement for adoption with the relative caretakers. The matter was continued briefly for the ICWA expert to appear.

Appellant again was not present at the next court hearing. The parties stipulated to Gledhill as an Indian expert. Gledhill testified that she usually relied on a tribe's ICWA representative to provide specific information about cultural beliefs, values, and parenting practices, and she had no special knowledge regarding the Venetie. Gledhill had attempted unsuccessfully to contact the Venetie on three occasions and, therefore, in the minor's case, she relied on her general knowledge of Indian tribes. Gledhill continued to believe that continued care by the parents would be detrimental to the minor. Appellant's attorney asked Gledhill what the basis was "for [her] finding beyond a reasonable [*sic*] that it would be in [the minor]'s best interest to be adopted," and Gledhill responded: "My understanding is that the tribe is in agreement with the plan of adoption for [the minor], in addition to the fact that the mother was not offered services at the dispositional hearing. The father was in fact offered services and failed to participate."

Appellant's attorney argued that Gledhill's conclusions were deficient because she had no input from the parents, the relative caretakers, or the Venetie.

The juvenile court found beyond a reasonable doubt that active efforts had been made to provide remedial services and rehabilitative programs designed

to prevent the breakup of the Indian family. The court also found beyond a reasonable doubt that continued custody of the minor by the parents was likely to result in serious emotional or physical damage to the minor and that the minor's placement was consistent with the placement preferences of the ICWA. Finding clear and convincing evidence that the minor was likely to be adopted, the court ordered parental rights terminated.

## DISCUSSION

### I

### Adoptability

Appellant contends the evidence was insufficient to support a finding that the minor was adoptable. While we agree the evidence does not support that the minor was generally adoptable, we conclude there was sufficient evidence he was specifically adoptable by his relative caretakers.

██ " 'At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must make one of four possible alternative permanent plans for a minor child. . . . The permanent plan preferred by the Legislature is adoption.' " (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368 [52 Cal.Rptr.2d 474], italics omitted.) "In order for the court to select and implement adoption as the permanent plan, it must find, by clear and convincing evidence, the minor will likely be adopted if parental rights are terminated." (*In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1164 [53 Cal.Rptr.2d 93]; see § 366.26, subd. (c)(1).) We review an order terminating parental rights for substantial evidence. (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154 [94 Cal.Rptr.2d 693].)

Usually, the issue of adoptability focuses on the minor, "e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 [28 Cal.Rptr.2d 82].) However, "in some cases a minor who ordinarily might be considered unadoptable due to age, poor physical health, physical disability, or emotional instability is nonetheless likely to be adopted because a prospective adoptive family has been identified as willing to adopt the child." (*Id.* at p. 1650.)

"Where the social worker opines that the minor is likely to be adopted based solely on the existence of a prospective adoptive parent who is willing to adopt the minor, an inquiry may be made into whether there is any legal impediment to adoption by that parent [citations]. In such cases, the existence of one of these legal impediments to adoption is relevant because the legal

impediment would preclude the very basis upon which the social worker formed the opinion that the minor is likely to be adopted. [Citation.]" (*In re Sarah M., supra*, 22 Cal.App.4th at p. 1650.)

Appellant argues the minor was not generally adoptable due to his mental and physical delays and appellant's mental health problems, and because the ICWA placement preferences were applicable. We agree that the combination of these factors rendered the minor not generally adoptable.

■ The ICWA sets forth adoptive placement preferences that must be adhered to in the absence of good cause. (25 U.S.C. § 1915.) In the present matter, the social worker attempted to find an Indian foster placement for the minor prior to the jurisdictional hearing, to no avail. After the section 366.26 hearing had been set and the Venetie had intervened, the department again attempted to locate an ICWA-compliant adoptive placement for the minor, this time contacting numerous agencies and Indian adoption facilitators, in addition to the Venetie. Again, the department was unable to find a family that could meet the minor's needs, which it described as including "global delays" and appellant's mental health issues.

While it is possible that such circumstances could constitute good cause to deviate from the ICWA's placement preferences, this issue was not litigated in the juvenile court because a relative placement had been located that complied with those preferences. Furthermore, an exception to adoption may apply if adoption would substantially interfere with an Indian child's connection to his tribe or if the tribe "has identified guardianship, long-term foster care with a fit and willing relative, or another planned permanent living arrangement for the child." (§ 366.26, subd. (c)(1)(B)(vi)(II).) Again, this was not an issue at the section 366.26 hearing in the present matter because the Venetie were in support of adoption by the relative caretakers. Given all of the ICWA-related variables that could derail adoption with a family other than the relative caretakers, we conclude the minor was not generally adoptable.

■ However, we disagree with appellant that there was insufficient evidence the minor was specifically adoptable by his relative caretakers. The minor had been in his adoptive placement for nearly a year at the time of the section 366.26 hearing and had developed a bond with his relative caretakers, who were aware of his delays and were committed to adopting him. The social worker reported that, prior to the minor's placement with the relative caretakers, "[t]he requisite approval was completed," meaning, we assume, that the relatives and their home were assessed to ascertain their ability to meet the minor's needs, in compliance with statutory requirements. (§§ 309, subd. (d)(1), 361.3, subd. (a)(8), 361.4, subd. (a).) Additionally, the relative

caretakers had adopted two other children, now adults, and there was no evidence of any obstacles to their adoption of the minor.

As already noted, when a child is adoptable only because a particular family is willing to adopt, the juvenile court must consider whether there are any legal impediments to adoption by that family. Appellant claims the lack of evidence that the relative caretakers, here, had a foster care license and the fact that neither a home study nor a preliminary assessment by the relatives' county had been completed were "legal impediments" to adoption. Appellant is incorrect.

Appellant inaccurately cites *In re B.D.* (2008) 159 Cal.App.4th 1218 [72 Cal.Rptr.3d 153] for the proposition that the absence of a completed home study for the only potential adoptive family constitutes a legal impediment to adoption. In fact, in *In re B.D.*, it was "the absence of a foster care license or a preliminary assessment [that] constitute[d] a legal impediment to adoption." (*Id.* at p. 1233.) The reason this presented a legal impediment in that case was because the five children, some of whom exhibited challenging behaviors, had not been placed with the one family interested in adopting them as a sibling group, and the family's "status" "prevent[ed] [the] social worker from providing information about the children to the family, facilitating contact between the children and the family and placing the children in a preadoptive placement with the family." (*Id.* at pp. 1222, 1233–1234.)

Here, the minor had been placed in the prospective adoptive home for a considerable period of time when the section 366.26 hearing occurred. Furthermore, the preliminary assessment required by statute—including screening the family members' criminal records and prior referrals for child abuse or neglect, as well as an assessment of their ability to meet the minor's needs and their understanding of the legal and financial rights and responsibilities of adoption—was contained in the social worker's report for the hearing. (§ 366.22, subd. (b)(1)(D).)

■ Appellant argues that because an approved adoptive home study is a prerequisite to the filing of an adoption petition, there must be an approved home study for a child who is not generally adoptable before parental rights may be terminated. Contrary to appellant's assertion, where there is no evidence of any specific legal impediments to completing the adoption process, parental rights may be terminated to a specifically adoptable child regardless of whether a home study has been completed.

■ Appellant also maintains there was insufficient evidence as to when a home study would be completed, so "it was impossible for the court to know" if the adoption would be finalized within a reasonable time. It is true that a

finding of adoptability requires "clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time." (*In re Zeth S.* (2003) 31 Cal.4th 396, 406 [2 Cal.Rptr.3d 683, 73 P.3d 541].) According to appellant, the social worker's wording in a report in September 2007 suggested that the home study process had just begun and, consequently, "it was impossible for the court to know" if the home study could be completed and the adoption finalized within a reasonable time. In fact, the postpermanency review report filed in June 2007 stated that the relative caretakers were working closely with their county of residence to obtain a home study. Moreover, even if the home study process had just begun, there is nothing in the record to suggest there were any obstacles to completing it in a routine manner.

We note that at the section 366.26 hearing none of the parties, including appellant, sought to question any of the witnesses regarding impediments to adoption by the relative caretakers, nor does the record reveal any such impediments. Absent any evidentiary basis for questioning the feasibility of the minor's adoptive placement, we conclude the evidence sufficiently supports that the minor was specifically adoptable.

II

ICWA Issues

Appellant contends there were several violations of the ICWA.[4] We conclude her claims are without merit.

Appellant first asserts that testimony of more that one ICWA expert was required at the section 366.26 hearing before parental rights could be terminated. She relies on the use of the plural language in the ICWA requiring "testimony of qualified expert witnesses" before parental rights may be terminated. (25 U.S.C. § 1912(f).)

■ We disagree that the language cited by appellant requires more than one expert witness before parental rights may be terminated. In compliance with the ICWA's directive to the Secretary of the Interior to "promulgate such rules and regulations as may be necessary to carry out [its] provisions" (25 U.S.C. § 1952), the BIA issued guidelines for state courts. (Guidelines for State Courts; Indian Child Custody Proceedings 44 Fed.Reg. 67584 (Nov. 26, 1979) (Guidelines).) The Guidelines contain a provision stating that termination of parental rights requires "testimony of *one or more* qualified expert

---

[4] The Venetie are a federally recognized "Native Entity Within the State of Alaska" (73 Fed.Reg. 18553, 18557 (Apr. 4, 2008)), and the department does not dispute that the minor is an Indian child for purposes of the ICWA.

witnesses." (*Id.* at p. 67592, D.3(b), italics added.) Although the Guidelines represent the BIA's interpretation of the ICWA and are not binding (*id.* at p. 67584), "the construction of a statute by the executive department charged with its administration is entitled to great weight." (*In re Junious M.* (1983) 144 Cal.App.3d 786, 792, fn. 7 [193 Cal.Rptr. 40].)

Federal rules of construction are in accord with this interpretation, as they provide that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise[,] [¶] . . . [¶] words importing the plural include the singular . . . ." (1 U.S.C. § 1.) In other words, "the plural and singular are interchangeable." (*D.A.W. v. State* (Alaska 1985) 699 P.2d 340, 342.)

Pointing to a general provision in the ICWA stating that it establishes minimum federal standards for removal and placement of Indian children (25 U.S.C. § 1902), appellant argues that any ambiguity regarding the meaning of the language must be resolved in favor of Indians. (See *Montana v. Blackfeet Tribe* (1985) 471 U.S. 759, 766 [85 L.Ed.2d 753, 759, 105 S.Ct. 2399].) We conclude that the Guidelines and the relevant federal rules of construction resolves any possible ambiguity on the subject.

Next, appellant claims there was insufficient evidence presented at the section 366.26 hearing that her continued custody of the minor was likely to result in serious emotional or physical damage to him. Again, we disagree.

■ In order to terminate parental rights when an Indian child is involved, there must be "a determination, supported by evidence beyond a reasonable doubt . . . that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (25 U.S.C. § 1912(f).)

Appellant maintains the evidence relied on by the juvenile court at the section 366.26 hearing—the department's report and addendum, and the ICWA expert's testimony—was insufficient to support such a finding because none of the evidence contained any current information about her. The report prepared by the social worker for the section 366.26 hearing chronicled the basis for the minor's removal, including his positive test for methamphetamine at birth and the withdrawal symptoms he suffered thereafter, as well as the previous removal of appellant's four other children, two of whom were also born with positive toxicology screens and three of whom suffered injuries consistent with nonaccidental trauma while in her care. The ICWA expert noted that services were not offered to appellant based on her failure to rehabilitate from substance abuse and reunify with her other children, and she stated that, based on her review of court reports, correspondence, and interviews, it was her opinion that continued custody of the minor by the

parents was likely to result in serious emotional or physical damage to the minor. It is beyond dispute that appellant's repeated exposure of her children to drugs and physical abuse warranted this conclusion.

We are compelled to note that we find appellant's complaint somewhat disingenuous regarding the lack of current information as to her. Appellant last appeared in court in this matter in December 2006, when the juvenile court denied her final request for modification because she "ha[d] not demonstrated consistency in her sob[]riety? and ordered the minor transitioned into the home of the relative caretakers. The ICWA expert testified that her previous attempts to contact appellant had been unavailing. Appellant did not visit the minor after he was placed with the relative caretakers, and the minor had no bond with appellant. We infer from appellant's total lack of participation in the proceedings for nearly a year preceding the termination of her parental rights that nothing had changed with regard to her ability to assume custody of the minor.

Appellant also claims the termination of her parental rights was invalid because no evidence was presented regarding the prevailing social and cultural standards of the minor's tribe. We conclude appellant was not prejudiced by any error that may have occurred in this regard.

The ICWA does not require evidence of the social and cultural standards of an Indian child's tribe before parental rights are terminated, although the Guidelines recognize that qualified experts with such information "are most likely to meet the requirements for a qualified expert witness" in such proceedings. (Guidelines, 44 Fed.Reg. at p. 67593, D.4(b) & Commentary.) However, section 224.6, subdivision (b)(2), which went into effect in California in 2007, imposes this requirement. This section provides that, in determining whether to terminate parental rights when an Indian child is involved, the juvenile court must "[c]onsider evidence concerning the prevailing social and cultural standards of the Indian child's tribe, including that tribe's family organization and child-rearing practices."

As explained in commentary to the Guidelines and cited by the sponsor of the bill that added section 224.6, "knowledge of tribal culture and childrearing practices will frequently be very valuable to the court" in determining the likely impact of parental custody under the standards of the ICWA because "[s]pecific behavior patterns will often need to be placed in the context of the total culture to determine whether they are likely to cause serious emotional harm." (Guidelines, 44 Fed.Reg. at p. 67593, D.4 & Commentary; see Sen. Com. on Judiciary, com. on Sen. Bill No. 678 (2005–2006 Reg. Sess.) Aug. 23, 2005, pp. 11–12.)

In appellant's case, however, evidence concerning the social and cultural standards of the Venetie could not possibly have impacted the juvenile court's determination concerning appellant's ability to assume custody of the minor. This is not a case in which removal of the minor was attributable to "cultural bias"—the family's nonconformance with "the decision-maker's stereotype of what a proper family should be." (Guidelines, 44 Fed.Reg. at p. 67593, D.3 & Commentary.) As already discussed, the minor, as well as two of his siblings, were drug-exposed in utero, with the minor suffering withdrawal symptoms at birth and continuing developmental problems. The minor's siblings had also been physically abused while in appellant's care.

Appellant urges us to suppose this conduct might have fallen within the social and cultural standards of the Venetie, if only such evidence had been presented. This suggestion is ludicrous. Appellant had no Venetie heritage and there is nothing in the record to indicate that her behavior was affected by ties to any Indian tribe. Moreover, appellant's actions with regard to the minor were objectively dangerous. Finally, implicit in the Venetie's acquiescence to termination of parental rights and adoption by the relative caretakers was an acknowledgement by the tribe that their social and cultural standards did not tolerate parental conduct of this nature. Accordingly, we conclude appellant was not prejudiced by any error in failing to present evidence of the social and cultural standards of the Venetie.

Finally, appellant claims notice to the Apache tribes was insufficient because it provided no information about the maternal grandfather and paternal grandmother. We conclude any error was harmless.

It is true that an ICWA notice must contain information about the Indian child's biological relatives, including grandparents and great-grandparents. (25 C.F.R. § 23.11 (2005); § 224.2, subd. (a)(5)(C).) However, errors in an ICWA notice are subject to review under a harmless error analysis. (*In re Alexis H.* (2005) 132 Cal.App.4th 11, 14–16 [33 Cal.Rptr.3d 242].)

The only Apache ancestry reported was by appellant's grandmother, who claimed her maternal grandmother and the maternal great-grandfather had Apache heritage. The available information about these individuals was contained on the ICWA notices. Although it was error to omit information about the paternal grandmother, there was no claim that she had Indian heritage; thus, no prejudice could have occasioned the omission.

And while, presumably, the maternal grandfather would have had Apache heritage through the maternal great-grandfather, none of the Apache tribes determined the minor to be an Indian child based on the maternal great-grandfather's ancestry. Accordingly, it can be inferred that information about

the maternal grandfather would not have led to a different determination. Thus, any error was harmless.

## DISPOSITION

The juvenile court's orders are affirmed.

Sims, Acting P. J., and Nicholson, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 27, 2008, S165138.