# State Taxation of Income of Native American Armed Forces Members

The Soldiers' and Sailors' Civil Relief Act prohibits States from taxing the military compensation of Native American armed forces members who are residents or domiciliaries of tribal reservations from which they are absent by reason of their military service.

November 22, 2000

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF DEFENSE

This memorandum responds to your letter to the Acting Associate Attorney General requesting advice as to whether States may tax the military compensation earned by Native American service members who are residents or domiciliaries of federally recognized tribal reservations. As we explain more fully below, we conclude that the Soldiers' and Sailors' Civil Relief Act, construed in light of general principles of federal Indian law, prohibits States from taxing the military compensation of Native American service members who are residents or domiciliaries of tribal reservations, and who are absent from those reservations by virtue of their military service.

## BACKGROUND ·

Pursuant to agreements between the States and the Department of Treasury entered into under 5 U.S.C. § 5517 (1994 & Supp. IV 1998),[1] the Department of Defense generally withholds state income tax from the military compensation of service members, including Native American service members, unless the member appropriately claims exemption. Several members of Congress recently wrote to the Secretary of Defense, the Attorney General, and the Secretary of the Interior, asking for their personal intervention to ensure that Native American service members who claim a federally recognized Indian reservation as their legal

---

[1] 5 U S C § 5517 provides, in pertinent part:

(a) When a State statute—

(1) provides for the collection of a tax either by imposing on employers generally the duty of withholding sums from the pay of employees and making returns of the sums to the State, or by granting to employers generally the authority to withhold sums from the pay of employees if any employee voluntarily elects to have such sums withheld; and

(2) imposes the duty or grants the authority to withhold generally with respect to the pay of employees who are residents of the State; the Secretary of the Treasury, under regulations prescribed by the President, shall enter into an agreement with the State within 120 days of a request for agreement from the proper State official The agreement shall provide that the head of each agency of the United States shall comply with the requirements of the State withholding statute in the case of employees of the agency who are subject to the tax and whose regular place of Federal employment is within the State with which the agreement is made. In the case of pay for service as a member of the armed forces, the preceding sentence shall be applied by substituting "who are residents of the State with which the agreement is made" for "whose regular place of Federal employment is within the State with which the agreement is made."

domicile are not subject to such withholding. *See* Letter for Hon. William S. Cohen, Secretary of Defense, Hon. Janet Reno, Attorney General, and Hon. Bruce Babbitt, Secretary of the Interior, from Hon. George Miller, Senior Democratic Member, House Committee on Resources, et al. (July 18, 2000) ("Miller letter"). The letter stated that under section 514 of the Soldiers' and Sailors' Civil Relief Act ("SSCRA"), ch. 581, 56 Stat. 769, 777 (codified as amended at 50 U.S.C. app. § 574 (1994)), a military service member "does not lose his permanent residence or domicile solely because of [his] absence [from the place of residence or domicile] in compliance with military orders," and it maintained that the SSCRA "applies to Native Americans as it does to all other Americans residing in lands under the jurisdiction of the United States." Miller letter at 2. Accordingly, the letter asserted, "[a] Native American's domicile should therefore remain unchanged by military service, and a tribal member who resides on a reservation would enjoy the same tax status (i.e. immunity) he had enjoyed in his home state." *Id.* The letter concluded by stating that "[t]he Department [of Defense] should change these [Native American] service members' [income tax] withholding forms to reflect an exemption from state withholding as authorized in the Treasury Financial Manual instructing federal agencies on deductions and withholding issues," and it urged that "no greater burden of proof should be placed on tribal members to establish residency than on any other member of the military." *Id.* at 3.

After receiving the Miller letter, you wrote to the Acting Associate Attorney General requesting an opinion from the Department of Justice as to the applicability of the SSCRA to Native American service members who claim a federally recognized tribal reservation as their residence or domicile. *See* Letter for Dan Marcus, Acting Associate Attorney General, from Douglas A. Dworkin, General Counsel, Department of Defense (Aug. 9, 2000) ("Dworkin letter"). Your letter noted that while no federal court has yet addressed this question, three state tribunals have concluded that they lacked the authority to impose an income tax on the military compensation of Native Americans domiciled on tribal reservations within their respective States. *Id.* at 1.[2] In order to determine whether to continue withholding state income tax from the military pay of those Native American service members who claim a tribal reservation as their residence or domicile, you asked the Department of Justice to provide its opinion on the matter.[3]

---

[2] *See Fatt v. Utah State Tax Comm'n,* 884 P.2d 1233 (Utah 1994); *Turner v. Wisconsin Dep't of Revenue,* WI St Tax Rep (CCH) P 202–744 (1986), Letter for Emil B. Beck, from Gregory B Radford, Assistant Director, Personal Taxes Division, North Carolina Department of Revenue, *Re: Docket No. 99–386* (Jan. 25, 2000)

[3] Your letter asked the Department to address three sets of questions·

1 Is a tribal reservation a residence or domicile in a "State, Territory, possession, or political subdivision of any of the foregoing" such that the provisions of 50 U S C app. § 574 preserve it as the exclusive residence or domicile of a person who is away from such residence or domicile pursuant to military orders? Is the member not also a resident or domiciliary of the state in which the reservation is located?

2. Is the military compensation earned by a Native American while away from his or her domicile on a tribal reservation pursuant to military orders deemed to have been earned exclusively on the reserva-

Continued

295

## DISCUSSION

Determining whether States may, consistent with the SSCRA, tax the military compensation of Native American service members who claim a federally recognized tribal reservation as their place of domicile or residence requires interpreting relevant provisions of the SSCRA against the backdrop of general principles of federal Indian law. We therefore outline some relevant aspects of those general principles before proceeding to discuss the SSCRA and its application here.

### General Principles of Federal Indian Law

Historically, the Supreme Court has applied two related principles to States' attempts to exercise jurisdiction over Indian tribes, their reservations, and their members. The first is that of Indian sovereignty. This principle is generally associated with Chief Justice Marshall's explanation that Indian nations are "distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all the lands within those boundaries, which is not only acknowledged, but guarantied by the United States." *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 557 (1832). Building on *Worcester*, subsequent Supreme Court decisions held that "[i]t followed from this concept of Indian reservations as separate, although dependent nations, that state law could have no role to play within the reservation boundaries." *McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164, 168 (1973); *see County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation*, 502 U.S. 251, 257 (1992) (describing the Court's decision in *Worcester* as concluding that "within reservations state jurisdiction would generally not lie").

More recently, however, the Indian sovereignty doctrine has lost some of its "independent sway," *County of Yakima*, 502 U.S. at 257, and has given way to a second principle: federal preemption. *See McClanahan*, 411 U.S. at 172 ("[T]he trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal preemption."). The source of this principle is the Constitution, which assigns to the federal government the responsibility for regulating commerce with Indian tribes and for treaty-making. *See* U.S. Const. art. I, § 8, cl. 3; *id.* art. II, § 2, cl. 2; *see also McClanahan*, 411 U.S. at 172 n.7; *Williams v. Lee*, 358 U.S. 217, 219 n.4 (1959). In light of that grant of federal authority, cases raising questions about the boundaries of permis-

---

tion, so as to exempt it from income taxation by the state in which the reservation is located under the rule set forth in *McClanahan* [*v. Ariz. State Tax Comm'n*, 411 U.S 164 (1973),] and subsequent cases? If so, does this apply to all tribal reservations of federally recognized tribes?

3. If it is the opinion of the Department of Justice that Native Americans who claim a tribal reservation as their domicile are not subject to state income tax with respect to their military compensation, will that opinion serve as the basis for us to terminate state tax withholding if a member certifies that he or she meets the stated criteria?

Dworkin letter at 2.

sible state jurisdiction over Indian tribes, their members, and their lands are now typically resolved by giving "individualized treatment" to the "particular treaties and specific federal statutes, including statehood enabling legislation, as they, taken together, affect the respective rights of States, Indians, and the Federal Government." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148 (1973). The Indian sovereignty doctrine remains relevant, however, as "a backdrop against which the applicable treaties and federal statutes must be read." *McClanahan*, 411 U.S. at 172. In the area of state taxation, the Supreme Court's application of the federal preemption and Indian sovereignty principles has yielded certain specific rules, two of which are relevant to the matter before us. First, "absent cession of jurisdiction or other federal statutes permitting it," States may not tax "Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation." *Mescalero*, 411 U.S. at 148 (describing the rule announced in *McClanahan*, 411 U.S. at 164); *County of Yakima*, 502 U.S. at 258 ("[O]ur cases reveal a consistent practice of declining to find that Congress has authorized state taxation [in this area] unless it has 'made its intention to do so unmistakably clear.' ") (quoting *Montana v. Blackfeet Tribe*, 471 U.S. 759, 765 (1985)).⁴ Second, "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State." *Mescalero*, 411 U.S. at 148–49. In the state taxation context, this second rule means that if a Native American resident of a tribal reservation earns income outside that reservation but within the State in which the reservation is located, then, absent federal law to the contrary, the State may tax that income. *Id.*⁵

In cases not squarely controlled by these two rules, the Court applies the federal preemption principle against the backdrop of the Indian sovereignty principle. Preemption analysis asks whether the state law or action at issue "stands as an obstacle to the accomplishment and execution of the full purposes and objectives

---

⁴ Before announcing this rule, the *McClanahan* Court analyzed, *inter alia*, the particular nineteenth century treaty that the federal government had entered into with the Navajo Nation, and the Arizona Enabling Act, both of which contained language indicating that the federal government's authority over Navajo reservations was exclusive. *See* 411 U.S. at 173–75. Thus, *McClanahan* might be read as having turned on a case-specific preemption holding — a determination that the treaty, enabling act, and other federal legislation relevant to the case preempted the state taxation at issue But the Court did not, in fact, find any specific federal preemption. As then — Associate Justice Rehnquist later explained, "[a]lthough no legislation directly provided that Indians were to be immune from state taxation under these circumstances, the enactments reviewed were certainly suggestive of that interpretation . The [*McClanahan*] Court therefore declined to infer a congressional departure from the prior tradition of Indian immunity absent an express provision otherwise." *Washington v Confederated Tribes*, 447 U.S. 134, 179 (1980) (Rehnquist, J , concurring in part and dissenting in part); *see* Felix Cohen, *Handbook of Federal Indian Law* 269–70 (1982 ed ) (noting that *McClanahan* held the state tax at issue to intrude on a sphere of activities subject only to federal and tribal authority, "despite the lack of any specific conflict with tribal law") That is, *McClanahan* announced a generally applicable default rule that prohibits state taxation of "reservation lands and reservation Indians" except where authorized by Congress, *County of Yakima*, 502 U S at 258, and it analyzed the relevant treaty, enabling act, and other legislation simply to confirm that Congress had not given such authorization in that case *See* Thomas C Mundell, *The Tribal Sovereignty Limitation on State Taxation of Indians: From* Worcester *to* Confederated Tribes *and Beyond*, 15 Loy. L.A L. Rev 195, 216–17 (1982)

⁵ It is not clear whether this rule also extends to off-reservation income generated outside the State where the reservation is located *See infra* note 11

of Congress." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *see Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995); *Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1977). To the extent the analysis involves the interpretation of a federal statute, the Court has emphasized that statutes affecting Indians "are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe*, 471 U.S. at 766; *see Bryan v. Itasca County*, 426 U.S. 373 (1976); *Choate v. Trapp*, 224 U.S. 665 (1912). "[I]n examining the preemptive force of the relevant federal legislation," courts "are cognizant of both the broad policies that underlie the legislation and the history of tribal independence in the field at issue." *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 176 (1989).

## The Soldiers' and Sailors' Civil Relief Act

The SSCRA was enacted in 1940. *See* Act of Oct. 17, 1940, ch. 888, 54 Stat. 1178 (codified as amended at 50 U.S.C. app. §§ 501–593 (1994)). It was "[i]n many respects . . . a reenactment" of legislation that had been passed in 1918 and had expired at the end of World War I. *Conroy v. Aniskoff*, 507 U.S. 511, 516 (1993); *see* Act of Mar. 8, 1918, ch. 20, 40 Stat. 440 ("Act of Mar. 8, 1918").[6] Noting the substantial similarities between the 1918 and 1940 statutes, the Supreme Court observed that the legislative history of the former could provide useful indications of congressional intent with respect to the latter. *See Boone v. Lightner*, 319 U.S. 561, 565 (1943). That earlier legislative history indicates that Congress intended to "protect[ ] . . . persons in military service of the United States in order to prevent prejudice or injury to their civil rights during their term of service and to enable them to devote their entire energy to the military needs of the Nation." Act of Mar. 8, 1918, § 100.

Congress amended the SSCRA in 1942, in part in order to "make available additional and further relief and benefits to persons in the military and naval forces." S. Rep. No. 77–1558, at 2 (1942). The 1942 amendments added section 514, ch. 581, 56 Stat. 769, 777 (codified as amended at 50 U.S.C. app. § 574 (1994)). The first two sentences of the current version of that provision are reproduced below:

> For the purposes of taxation in respect of any person, or of his personal property, income, or gross income, by any State, Territory, possession, or political subdivision of any of the foregoing, or by the District of Columbia, such person shall not be deemed to have lost a residence or domicile in any State, Territory, possession, or

---

[6] Both the House and Senate Reports accompanying the SSCRA's passage in 1940 described it as "in substance, identical with the [1918 Act]." H.R. Rep No 76–3001, at 3 (1940), S Rep. No 76–2109, at 4 (1940).

political subdivision of any of the foregoing, or in the District of Columbia, solely by reason of being absent therefrom in compliance with military or naval orders, or to have acquired a residence or domicile in, or to have become resident in or a resident of, any other State, Territory, possession, or political subdivision of any of the foregoing, or the District of Columbia, while, and solely by reason of being, so absent. For the purposes of taxation in respect of the personal property, income, or gross income of any such person by any State, Territory, possession, or political subdivision of any of the foregoing, or the District of Columbia, of which such person is not a resident or in which he is not domiciled, compensation for military or naval service shall not be deemed income for services performed within, or from sources within, such State, Territory, possession, political subdivision, or District, and personal property shall not be deemed to be located or present in or to have a situs for taxation in such State, Territory, possession, or political subdivision, or district.

50 U.S.C. app. § 574(1).[7] Section 514's first sentence generally provides that, for purposes of state and local income and property taxation, a military service member's residence in a "State, Territory, possession, or political subdivision of any of the foregoing, or in the District of Columbia," shall not change solely because the service member is absent from his place of residence in compliance with military orders. *Id.* The second sentence generally provides that, for purposes of income and property taxation imposed by any "State, Territory, possession, or political subdivision of any of the foregoing, or the District of Columbia," military compensation earned within such a jurisdiction by a service member who does not reside there shall not be deemed income earned within the jurisdiction. *Id.* Taken together, these provisions have the effect, *inter alia*, of "prevent[ing] multiple State taxation of the property and income of military personnel serving within various taxing jurisdictions through no choice of their own." H.R. Rep. No. 77–2198, at 6 (1942); S. Rep. No. 77–1558, at 11.

In the legislative history to the SSCRA's 1942 amendments, Congress made clear that "[a]ny doubts that may arise as to the scope and application of the act should be resolved in favor of the person in military service involved." H.R. Rep. No. 77–2198, at 2; S. Rep. No. 77–1558, at 2. The Supreme Court, in turn, has emphasized that the SSCRA "is always to be liberally construed," *Boone*, 319 U.S. at 575, and should be read "with an eye friendly to those who dropped

---

7 Although the concepts of "residence" and "domicile" may in some settings have slightly different legal consequences, *see Black's Law Dictionary* 1309 (6th ed 1990) (comparing and distinguishing the two terms), section 514 uses them together without distinguishing them. For purposes of state taxation, therefore, section 514 preserves military service members' pre-service domicile and residence in precisely the same manner Because the two concepts are not distinguished for these purposes, the balance of this memorandum generally uses the term "residence."

their affairs to answer their country's call," *California v. Buzard*, 382 U.S. 386, 395 (1966) (quoting *Le Maistre v. Leffers*, 333 U.S. 1, 6 (1948)). Of course, the protections afforded by section 514 are not without limits. As the Supreme Court has explained, "[s]ection 514 does not relieve servicemen stationed away from home from all taxes of the host State." *Sullivan v. United States*, 395 U.S. 169, 180 (1969) (holding that section 514's provisions do not extend to sales and use taxes in the host state). With respect to income and property taxes, however, the caselaw emphasizes the need for a liberal construction. *See Buzard*, 382 U.S. at 395. Thus, although section 514's "predominant legislative purpose" is to protect military personnel from "multiple State taxation" of their income and property, *Sullivan*, 395 U.S. at 180, the Court has not limited the scope of section 514 to this one problem:

> [T]hough the evils of potential multiple taxation may have given rise to this provision, Congress appears to have chosen the broader technique of the statute carefully, freeing servicemen from both income and property taxes imposed by any state by virtue of their presence there as a result of military orders. It saved the sole right of taxation to the state of original residence *whether or not that state exercised the right.* Congress, manifestly, thought that compulsory presence in a state should not alter the benefits and burdens of our system of dual federalism during service with the armed forces.

*Dameron v. Brodhead*, 345 U.S. 322, 326 (1953) (emphasis added).[8] This broad statutory purpose and presumption in favor of the military service member necessarily informs our application of section 514 to the instant matter.

*Section 514 and the Military Income of Native American Service Members*

In order to determine whether section 514 of the SSCRA permits States to tax the military income of Native American service members whose residence is on a tribal reservation, it is useful first to distinguish among the States that might attempt to impose such taxation. They fall into three general categories: States where the service member works but only because of his military service; States where the service member lives but only because of his military service; and States containing the tribal reservation on which the service member lived until commencing his military service. We address these categories in turn.

---

[8] In *Sullivan*, the Court explained that, although it had previously described section 514's purpose broadly in *Dameron*, the provision's "predominant legislative purpose" is "to prevent multiple State taxation." 395 U S. at 180. Because "the substantial risk of double taxation under multi-state ad valorem property taxes does not exist with respect to sales and use taxes," the Court concluded that section 514's protections do not cover host States' sales and use taxes *Id.*

Section 514 explicitly addresses both the first and second categories. As to the first, the second sentence of section 514 provides, in pertinent part:

> For the purposes of taxation in respect of the personal property, income, or gross income of any such person by any State, Territory, possession, or political subdivision of any of the foregoing, or the District of Columbia, of which such person is not a resident or in which he is not domiciled, compensation for military or naval service shall not be deemed income for services performed within, or from sources within, such State, Territory, possession, political subdivision, or District.

50 U.S.C. app. § 574(1). This provision prevents a State from taxing military compensation earned in its jurisdiction by service members who are not otherwise residents of the State. *See Dameron*, 345 U.S. at 326 (section 514 "saved the sole right of taxation to the state of original residence whether or not that state exercised the right"). As to the second category, the first sentence of section 514 provides that no person shall be deemed "to have acquired a residence or domicile in, or to have become resident in or a resident of, any other State, Territory, possession, or political subdivision of any of the foregoing, or the District of Columbia, while and solely by reason of being . . . absent" from his pre-military service residence. 50 U.S.C. app. § 574(1). This provision clearly prohibits a State from taxing the military income of a service member who lives in that State solely in order to comply with his service obligations. *See Buzard*, 382 U.S. at 393 ("The very purpose of § 514 in broadly freeing the nonresident serviceman from the obligation to pay property and income taxes was to relieve him of the burden of supporting the governments of the States where he was present solely in compliance with military orders."). For Native Americans, like other military service members, neither the State where a service member works due only to military orders nor a state in which a service member lives due only to such orders may tax the service members' military income.

The third category presents a somewhat more complex case. In order to determine whether the SSCRA permits the State containing a service member's reservation residence to tax his military income, we look initially to the first sentence of section 514. That sentence provides that a military service member "shall not be deemed to have lost a residence or domicile in any State, Territory, possession, or political subdivision of any of the foregoing, or in the District of Columbia, solely by reason of being absent therefrom in compliance with military or naval orders." 50 U.S.C. app. § 574(1). A threshold question is whether this provision preserves the tribal residence of Native Americans. For three reasons, we conclude that it does.

First, an Indian reservation is arguably a "residence . . . in [a] State." That is, since an Indian reservation is located within the geographical boundaries of a State or States, a Native American who resides on a reservation has a residence in a State just as, for example, one who resides in a particular city has a residence in the State containing that city. *See Cohen, supra* note 4, at 649 ("[T]ribal lands within the boundaries of state or organized territories have always been considered to be geographically part of the respective state or territory."). Thus, the first sentence of section 514 arguably provides that a Native American service member shall not be deemed to have lost her residence on a reservation located within a State "solely by reason of being absent therefrom in compliance with military or naval orders." 50 U.S.C. app. § 574(1).

Second, and alternatively, while neither the text of the SSCRA nor its legislative history defines the terms "State, Territory, possession, or political subdivision," an Indian reservation might itself be regarded as a "Territory" for purposes of section 514. Although territories are not generally understood to be subsumed within State boundaries, "when Congress uses the term 'territory', this may be meant to be synonymous with 'place' or 'area', and not necessarily to indicate that Congress has in mind the niceties of language of a political scientist." *Moreno Rios v. United States*, 256 F.2d 68, 71 (1st Cir. 1958). Accordingly, the precise scope of the term "Territory" depends on the purpose and nature of the particular statute in which it is used. *See District of Columbia v. Carter*, 409 U.S. 418, 420 (1973) ("Whether the District of Columbia constitutes a 'State or Territory' within the meaning of any particular statutory or constitutional provision depends upon the character and aim of the specific provision involved.").[9] There is no

---

[9] In *United States ex rel Mackey v Coxe*, 59 U S. (18 How ) 100 (1855), for example, the Court held that for purposes of a federal full faith and credit statute covering "letters testamentary or of administration    . granted, by the proper authority in any of the United States or the territories thereof," a Cherokee Indian reservation "may be considered a territory of the United States." *Id.* at 103–04; *see id.* at 103 (explaining that the Indian reservation was "not a foreign, but a domestic territory—a territory which originated under our constitution and laws"), *see also, e.g , In re Larch*, 872 F 2d 66, 68 (4th Cir. 1989) (holding that "the Cherokee tribe is a 'state'" under the Parental Kidnapping Prevention Act, which defines "State" as "a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or a territory or possession of the United States," 28 U S.C. § 1738A(b)(8)); *Jim v. CIT Fin. Servs Corp*, 87 N M. 362, 363 (1975) (citing *Mackey* and holding that "the Navajo Nation is a 'territory' within the meaning of [28 U S.C § 1738]"); Cohen, *supra* note 4, at 383, 385, 649 n.42 (noting that "territory" has been held to encompass tribal reservations in some contexts). Similar results have been reached in interpreting state statutes. In *Tracy v. Super. Ct.*, 168 Ariz 23 (1991) (en banc), for example, the Supreme Court of Arizona considered whether a Native American tribe could be considered a "territory" under Arizona's Uniform Act to Secure the Attendance of Witnesses From Without a State in Criminal Proceedings, Ariz. Rev. Stat §§ 13–4091 to 13–4096 (1989) The court noted that "Indian tribes .    have often been regarded as territories for purposes of various statutory enactments," *Tracy, 168 Ariz.* at 32 (collecting cases), and explained that "[t]he proper approach is to analyze each statute, in terms of its purpose and policy, to determine whether Indian tribes may be regarded as territories within the statute's intent " *Id.* at 33. After undertaking that approach, the court concluded that "a tribe may be considered a territory for purposes of statutory enactments such as the one now before us " *Id.* at 44

The Supreme Court has, however, indicated its support for the opposite conclusion in other statutory contexts. *See, e.g., New York ex rel. Kopel v. Bingham*, 211 U S 468, 474–75 (1909) (citing with approval *Ex Parte Morgan*, 20 F. 298, 305 (W D Ark. 1883), in which a district court held that the Cherokee nation was not a "territory" under the federal extradition statute). And at least one lower federal court has concluded that a tribal reservation does not constitute a "Territory" under 28 U S.C. § 1738 (1994), the general full faith and credit statute. *See Wilson v. Marchington*, 127 F 3d 805, 808–09 (9th Cir 1997), *cert. denied*, 523 U S 1074 (1998) But in *Wilson*, the

indication in either the text of section 514 or its legislative history that Congress intended to define "Territory" narrowly so as to exclude Native American service members from the statute's protections. Thus, it is arguable that the term as employed in section 514 should be read to include Indian reservations.

Third, even assuming an Indian reservation is not a "Territory" or a "residence . . . in [a] State" within the meaning of section 514, we think it is clear that the statute's recitation of jurisdictions is not intended and should not operate as a limitation on the protection the SSCRA affords to all service members. By its terms, the first sentence of section 514 covers military compensation earned by "any person." 50 U.S.C. app. § 574(1). As the Supreme Court has explained, in the absence of a clear expression to the contrary, "a general statute in terms applying to all persons includes Indians and their property interests." *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 116 (1960). Here, there is no indication that Congress intended to exclude Native American residents of tribal reservations from section 514's coverage. Any residual ambiguity on this point is settled by Congress's specific guidance to resolve "[a]ny doubts that may arise as to the scope and application of the [SSCRA] . . . in favor of the person in military service involved," H.R. Rep. No. 77-2198, at 2, by the Supreme Court's holding that the SSCRA is "always to be liberally construed," *Boone*, 319 U.S. at 575, and by the Court's similar directive that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions to be interpreted to their benefit," *Blackfeet Tribe*, 471 U.S. at 766. In light of these directives, we conclude that section 514 should be read to preserve the reservation residence of Native American service members.[10]

Next, we consider what consequences flow from section 514's preservation of Native Americans' reservation residence. It might be argued that, even though section 514 preserves a service member's pre-service residence, the State con-

---

Ninth Circuit based its holding not on a general finding that tribal reservations are not territories, but on the fact that, after 28 U.S.C § 1738 was enacted, Congress passed a number of other statutes expressly extending full faith and credit to certain tribal proceedings *See* 127 F 3d at 809 (citing 25 U.S.C. §§ 2201–2211 (1983), 25 U.S.C. § 1725(g) (1980), and 25 U.S.C §§ 1901 *et seq* ) The court observed that "[i]f full faith and credit had already been extended to Indian tribes, enactment of [the later statutes] would not have been necessary " *Id* Here, in contrast, there is no post-section 514 legislation to undermine the argument that section 514's use of the word "Territory" should be read to encompass tribal reservations

[10] It is true that the Supreme Court has "repeatedly said that tax exemptions are not granted by implication," and "[i]t has applied that rule to taxing acts affecting Indians as to all others " *Okla. Tax Comm'n v United States*, 319 U.S 598, 606 (1943). Accordingly, in *Oklahoma Tax Commission* the Court held that "[i]f Congress intends to prevent the State of Oklahoma from levying a general non-discriminatory estate tax applying alike to all its citizens, it should say so in plain words Such a conclusion can not rest on dubious inferences." *Id* at 607; *see Mescalero*, 411 U S at 156–57 Here, however, it is clear that by passing section 514 Congress did indeed intend to grant a tax exemption to military service members. That is, the statute satisfies the requirement that Congress state its intent to grant a tax exemption "in plain words." *Okla Tax Comm'n*, 319 U S at 607 The question is how that exemption applies to Native Americans who reside on tribal reservations. In such circumstances, courts follow the rule that "ambiguous statutes . . . are to be construed in favor of Indians, and this canon of statutory construction applies to tax exemptions " *Confederated Tribes v. Kurtz*, 691 F 2d 878, 881 (9th Cir 1982), *see Blackfeet Tribe*, 471 U S at 766, *see also Cotton Petroleum Corp ,* 490 U.S. at 176–77 ("[F]ederal pre-emption [of state taxing authority] is not limited to cases in which Congress has expressly — as compared to impliedly — preempted the state activity.").

taining a Native American service member's reservation may still tax his military compensation to the same extent as it may tax the military compensation of other service members whose pre-service residence is in that State. That argument is premised on the theory that Native Americans who live on their reservation are residents of both their reservation and the State in which it is located, and that section 514 preserves both those residences for income tax purposes. Absent federal law to the contrary, a State may tax off-reservation, in-state income earned by reservation Indians whose reservation is in that State. *See Mescalero*, 411 U.S. at 148–49 ("Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State."). Arguably, *Mescalero* implicitly recognizes that Native Americans who live on a reservation are residents of both their reservation and the State containing it, and that once they leave the reservation to work they are subject to the generally applicable tax laws to which all other residents of the State are subject, including tax liability for both in-state and out-of-state income. The validity of this view is unclear.[11] We need not attempt to resolve the issue here, however, because we conclude the SSCRA, especially when read in light of general principles of federal Indian law, preempts any authority a State containing a Native American's tribal residence may otherwise have to tax that Native American's military income.

---

[11] This uncertainty is due in part to the fact that while *Mescalero* made clear that a State may tax the off-reservation income of a Native American resident of a reservation within that State, it did not specify the precise source of that taxing power. As a general matter, a State may "tax all the income of its residents, even income earned outside the taxing jurisdiction." *Okla. Tax Comm'n v Chickasaw Nation*, 515 U S. 450, 462–63 (1995). But for nonresidents, a State generally may tax only income earned within the jurisdiction. *Id.* at 463 n 11 It is unclear which head of taxing authority supports the decision in *Mescalero* If it is the former, then the State may also tax the out-of-state income of Native Americans who reside on reservations within the State; if it is the latter, the State may not.

At bottom, the question here concerns the precise relationship between Native Americans residing on reservations and the States in which those reservations are located The question is not easily answered. On the one hand, there may be some basis for States to treat reservation Indians working off the reservation as full state residents. Indeed, it is clear that Native Americans are deemed state residents for certain purposes. *See Goodluck v Apache County*, 417 F Supp 13 (D. Ariz. 1975), *aff'd*, 429 U.S 876 (1976). "They have the right to vote, to use state courts, and they receive some state services." *McClanahan*, 411 U.S. at 173 (footnotes omitted). At least one court has relied on these facts to conclude that "[a]n enrolled member of a tribe living on a reservation is subject to three levels of governmental jurisdiction: the tribe, the state, and the federal government Being a resident of one does not remove the person from the jurisdiction of the others. An enrolled member of a tribe living on the tribe's reservation remains domiciled in the state and is a resident of the state for limited purposes." *Esquiro v Dept of Revenue*, 14 Or. Tax 130, 134 (Or. Tax 1997), *aff'd*, 328 Or 37 (Or. 1998). On the other hand, a leading treatise on federal Indian law suggests that reservation Indians working off the reservation are, for taxation purposes at least, in the same position as nonresidents working in the State. "[A]n Indian residing within a reservation but earning some income off the reservation can be taxed to the extent of the off-reservation income, *provided that the State bases its income tax on place of earning*." Cohen, *supra* note 4, at 417 (emphasis added). A federal district court recently took a similar approach. *See Lac du Flambeau Band of Lake Superior Chippewa Indians v. Zeuske*, 145 F. Supp.2d 969 (W D Wis. 2000). In that case, the court held that Wisconsin lacked the authority to tax income earned outside Wisconsin by a Native American resident of a tribal reservation located within Wisconsin According to the court, "[t]he state may tax persons resident within its borders who do not live on reservations because it has conferred upon these persons the benefit of domicile and its accompanying privileges and advantages. It has not conferred the same benefit upon tribal members residing on reservations, however. The right of tribal members to reside on the reservation derives from treaties entered into by the tribe in the nineteenth century." *Id* at 976

As noted above, preemption analysis asks whether "under the circumstances of th[e] particular case, [the State's] law stands as anobstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Geier*, 529 U.S. at 873 (quoting *Hines*, 312 U.S. at 67); *see Freightliner*, 514 U.S. at 287. Determining what constitutes a "sufficient obstacle" in this sense is "informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

> [W]hen the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed. If the purpose of the act cannot otherwise be accomplished — if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect — the state law must yield to the regulation of Congress within the sphere of its delegated power.

*Id.* (quoting *Savage v. Jones*, 225 U.S. 501, 533 (1912)).

The Supreme Court has explained that "[t]he very purpose of § 514 in broadly freeing the nonresident serviceman from the obligation to pay property and income taxes was to relieve him of the burden of supporting the governments of the States where he was present solely in compliance with military orders." *Buzard*, 382 U.S. at 393; *see also Dameron*, 345 U.S. at 326. As this passage suggests, section 514 is intended to provide that if an individual works in a certain jurisdiction because his military service requires him to be there, he should not be subject to any different burdens by virtue of that compulsory presence.[12] More specifically, compulsory presence in a particular place may not subject the service member to taxing authorities to which he was not already subject prior to his military service.

Before beginning military service, a Native American resident of a tribal reservation who does not work outside the reservation is not subject to taxation by the State in which the reservation is located. *See McClanahan*, 411 U.S. at 164. If that State were to tax that individual's military income on the theory that it is income earned off-reservation, it would subject him to an income tax to which he was not previously subject, and it would do so by virtue of his compulsory presence in a particular jurisdiction. Section 514's broad, generous purpose is to prevent precisely that eventuality.

---

[12] The legislative history to the SSCRA's predecessor supports this reading *See* Act of Mar. 8, 1918, § 100 (Congress intended to "protect[ ]   persons in military service of the United States in order to *prevent prejudice or injury to their civil rights during their term of service* and to enable them to devote their entire energy to the military needs of the Nation ") (emphasis added).

We recognize, of course, that some Native American service members could have been subjected to state income tax prior to joining one of the armed services. Under *Mescalero*, a State containing a Native American's tribal residence may, absent federal law to the contrary, subject that tribal member to income tax for income earned outside the reservation. *See* 411 U.S. at 148–49.[13] Prior to enlisting in the military, however, such an individual was not subject to state income tax in a general sense; rather, she was subject to such tax only to the extent that her income was earned outside a reservation. When a reservation Indian enters military service and is directed to perform that service outside her reservation, any income she earns for that service is earned off the reservation because of military orders. Thus, were a State to impose a tax on that military compensation, the tax would be incident to the service member's compulsory presence and work outside her tribal reservation. That is, the tax would result from the individual's compliance with military orders. Such a tax would run afoul of what the *Dameron* Court identified as section 514's core purpose: to protect military service members from being subjected to taxing authorities that rely solely on the members' compulsory presence in a particular jurisdiction as the basis for taxing them. *See* 345 U.S. at 326.[14]

We presume that section 514 was not designed to afford less protection to Native Americans than to other members of the military. *See Fed. Power Comm'n*, 362 U.S. at 120 ("[G]eneral Acts of Congress apply to Indians as well as to all others in the absence of a clear expression to the contrary."). Indeed, we are obliged under both federal Indian law and the SSCRA to construe any textual ambiguity on this point in favor of more, rather than less, protection. *See Blackfeet*

---

[13] As discussed above, *see supra* note 11, it is unclear whether a State's authority to tax income earned in the State by a Native American resident of a reservation who is working off the reservation is based on the State's authority to tax all residents of the State or the State's authority to tax income earned within the State by nonresidents working there. To the extent that a State's authority to tax such tribal members is based, not on the individual's residence in that State, but on the place where the income is generated, then, wholly apart from any tax exemption conferred by the SSCRA, the only tribal residents whose military income could possibly be subject to state taxation would be those who perform military service within the State in which their reservation residence is located. In light of our analysis of the SSCRA's preemptive force, we need not, and do not, reach that issue here. *See supra* p. 11

[14] We have found one case, *United States v. Kansas*, 810 F 2d 935 (10th Cir. 1987), that is arguably in tension with this analysis, but the outcome reached in that case is not contrary to the conclusion we reach here. In *Kansas*, the Tenth Circuit held that Kansas did not violate section 514 of the SSCRA by taking the military income of nonresident service members into account when determining the rate of income tax to be levied on their nonmilitary income earned in Kansas (typically by the service member's spouse). *See id.* at 936–38 & n.2. Although the court noted that "higher tax rates and, consequently, higher taxes on nonmilitary Kansas source income can result from including military pay in the state's rate-setting formula," *id* at 936, it concluded that "[n]either the legislative history nor the plain language of the SSCRA prohibits the use of the described military income in formulas which set rates of taxation on other income " *Id* at 938. The court specifically rejected the federal government's contention that "the potentially higher rates on Kansas source income constitute 'an indirect tax on the military compensation of nonresident military personnel,'" and held that "[t]here is here a potentially higher tax on Kansas source income, nothing more." *Id* (citation omitted) *Kansas* does not bear directly on the precise question at issue here, since in that case the service member was already subject to some host state income tax for nonmilitary income. But insofar as it may stand for the proposition that a military service member may be forced to shoulder a greater state income tax burden as a direct consequence of his compulsory presence in a particular jurisdiction in compliance with military orders, we find the Tenth Circuit's reasoning to conflict with section 514's broad, generous purpose as identified by the Supreme Court in *Dameron*, 345 U S at 326, *Buzard*, 382 U S at 393, and elsewhere.

*Tribe*, 471 U.S. at 766 (statutes affecting Indians "are to be construed liberally in favor of Indians, with ambiguous provisions to be interpreted to their benefit"); H.R. Rep. No. 77-2198, at 2 ("Any doubts that may arise as to the scope and application of the act should be resolved in favor of the person in military service involved."); *Boone*, 319 U.S. at 575 (SSCRA "is always to be liberally construed"); *Le Maistre*, 333 U.S. at 6 (SSCRA is to be read "with an eye friendly to those who dropped their affairs to answer their country's call."). Accordingly, we conclude that where a Native American service member who claims a tribal reservation as her residence earns military compensation outside that reservation by virtue of her compliance with military orders, section 514 prohibits the State containing the service member's reservation residence from taxing that military compensation.[15]

Finally, you have asked whether our opinion constitutes an adequate legal basis for the Department of Defense to terminate state income tax withholding for Native American service members who certify that they have met the specified criteria. Pursuant to statute, the Attorney General is responsible for providing legal advice to the heads of departments within the Executive Branch. *See* 28 U.S.C. § 512 (1994) ("The head of an executive department may require the opinion of the Attorney General on questions of law arising in the administration of his department."). The Attorney General has delegated that responsibility to the Office of Legal Counsel. *See* 28 C.F.R. § 0.25(a) (2000) (assigning to the Assistant Attorney General, Office of Legal Counsel, the responsibility for "[p]reparing the formal opinions of the Attorney General" and for "rendering informal opinions and legal advice to the various agencies of the Government"). In that regard, the legal advice of the Office of Legal Counsel constitutes the legal position of the Executive Branch, unless overruled by the President or the Attorney General. *See* H. Jefferson Powell, *The Constitution and the Attorneys General* xv (1999) ("The published opinions of the Attorneys General and, since 1977, of the Office of Legal Counsel, . . . constitute the formal legal views of that branch of the federal government charged with the faithful execution of the laws."). Accordingly, to the extent that a Native American service member can demonstrate residence on a federally recognized tribal reservation in a manner that satisfies the Defense Department's current standards for establishing entitlement to an exemption from state income tax withholding under section 514 of the SSCRA, the

---

[15] As discussed above, *see supra* note 4, the *McClanahan* rule barring state taxation of income earned on a reservation is a "categorical" one, *County of Yakima*, 502 U.S at 258, and prohibits state taxation of Indian lands and reservation Indians except where authorized by Congress But the rule would not apply — and our conclusion regarding the effect of the SSCRA could well be different — in a situation where Congress had separately authorized a State or States to tax the reservation income of a reservation Indian. We are aware of no such authorization. The *McClanahan* Court surveyed a number of federal statutes in this area, and concluded that they manifest "Congress' intent to maintain the tax-exempt status of reservation Indians." 411 U S. at 176. Similarly, in *Bryan v Itasca County*, the Court held that although 28 U S C § 1360 grants certain States jurisdiction over private civil litigation involving reservation Indians in state court, it does not grant those States general civil regulatory authority over reservation Indians *See* 426 U.S. at 385, 388–90. The Court therefore held that the statute does not empower States to tax property on a reservation

Defense Department may rely on the advice provided in this opinion and not with-hold state income tax from such a service member's military compensation. *Cf. Smith v. Jackson*, 246 U.S. 388, 390–91 (1918) (concluding that the Auditor of the Panama Canal Zone should have followed the ruling of the Attorney General on a question of federal statutory law).[16]

## CONCLUSION

For the foregoing reasons, we conclude that section 514 of the SSCRA prohibits States from taxing the military compensation of Native American service members who are residents of tribal reservations.

RANDOLPH D. MOSS
*Assistant Attorney General*
*Office of Legal Counsel*

---

[16] Moreover, we are informed by the Department's Tax Division that to the extent that Native American service members properly claiming a tribal reservation as their residence become involved in legal proceedings concerning their possible liability for state income tax on their military compensation, the Tax Division will, upon request from the Defense Department, provide legal representation to such service members where appropriate